## WOLFF *v.* NEW ORLEANS.

1. As long as a city exists, laws are void which withdraw or restrict her taxing power so as to impair the obligation of her contracts made upon a pledge expressly or impliedly given that it shall be exercised for their fulfilment. *Von Hoffman* v. *City of Quincy* (4 Wall. 535) cited on this point, and approved

2. Although such laws be enacted, *mandamus,* to compel her to exercise that power to the extent she possessed it before their passage, will lie at the suit of a party to such a contract who has no other adequate remedy to enforce it.

3. *Meriwether* v. *Garrett* (102 U. S. 472), distinguished.

ERROR to the Circuit Court of the United States for the District of Louisiana.

`Mr. George S. Lacey` for the plaintiff.
*Mr. Benjamin F. Jonas* and *Mr. Henry C. Miller, contra.*

MR. JUSTICE FIELD delivered the opinion of the court.

In March, 1876, the relator, Rebecca W. Wolff, recovered a judgment in the Circuit Court of the United States for the District of Louisiana, against the city of New Orleans, for the sum of $13,000. Execution was issued upon it and returned unsatisfied. She thereupon caused the judgment to be registered, under the act of the legislature of the State of 1870, known as Act No. 5, of the extra session of that year, to the provisions of which we shall hereafter refer; and then called upon the mayor and administrators of the city to pay it out of the contingent fund of the corporation, or, if it could not be paid in that way, to levy a special tax for its payment. The authorities having failed to comply with this request, she applied for a *mandamus* to compel them to pay it out of that fund or to levy a tax for that purpose, setting forth in her petition the recovery of the judgment, the issue of execution thereon, its return unsatisfied, and the refusal of the city authorities, as stated. An alternative writ was accordingly issued.

To this writ the city authorities appeared, and filed an answer to the petition, in which they admitted the recovery of the judgment, the issue of the execution, and its return unsatisfied, and set up that the judgment was recovered on bonds of

the city issued to the New Orleans, Jackson, and Great Northern Railroad Company, under the act of the legislature of the State, approved on the 15th of March, 1854; that no tax for the payment of the principal of those bonds was directed to be levied by that act, or any other act of the State; that there was no contingent fund of the city out of which the judgment could be paid; and that there were no moneys to the credit of the fund for current expenses, not otherwise appropriated; and that for these reasons they had not budgeted the judgment or levied a tax for its payment, and could not levy a special tax for that purpose. In an amended answer they further set up that at the time the bonds, upon which the judgment was re covered, were issued, a general statute of the State prohibited municipal corporations from incurring any debt or liability unless in the ordinance creating the same full provision was made for the payment of the principal and interest; and that a special statute prescribing the form of the ordinance by which a particular debt could be created, declared that such ordinance should be submitted to the legal voters of the corporation, and that the assent of the majority of them should be a condition of its validity; that the ordinance thus submitted providing for the issue of the bonds contained no provision for levying a tax to pay the principal of them, but contained another provision deemed ample for that purpose; and that, therefore, it was the evident intention of the legislature that the principal debt should be thus paid and not by means of taxation.

The relator demurred to the return of the respondents, but it would seem that when the demurrer was called, the case was submitted upon the pleadings and certain proofs which had been filed. The court decreed that the city authorities, exercising the discretion vested in them according to section 3 of Act No. 5, of the extra session of 1870, should appropriate from the money set apart in the budget or annual estimate for contingent expenses a sufficient sum of money to pay the judgment; but that if no appropriation be made by the common council of the city, the judgment should be paid according to its priority of filing and registry in the office of the controller, from the first money in the next annual estimate set apart for that purpose. The decree was accompanied by a provision that

nothing therein should require the common council to assess or levy any tax upon the city for the payment of the judgment, until the legislature of the State should authorize the same, thus assuming that existing legislation did not permit any such tax. To reverse this decree the relator has brought the case to this court.

The act which authorized the issue of the bonds, upon which the relator recovered judgment, provided that the railroad com pany should issue to the city certificates of stock equal in amount to the bonds received, and declared that the stock should remain "forever pledged for the redemption of said bonds." It made no other provision for the ultimate payment of the principal, but provided that a special tax should be levied each year to pay the annual interest. It is contended that only to the stock thus pledged and the income from it were the bondholders to look for the payment of the principal. The same position was urged in *United States* v. *New Orleans*, on the application by the relator in that case for a *mandamus* to compel the city authorities to levy a tax to pay judgments recovered upon similar bonds, and was adjudged to be untenable. 98 U. S. 381. The court held that the indebtedness of the city was conclusively established by the judgments recovered against it, and that their payment was not restricted to any species of property or revenues, or subject to any conditions. If there were any limitations upon the means by which payment of the bonds was to be had, they should have been insisted upon when the suits were pending, and have been continued in the judgments. The fact that no such limitations were there found was conclusive that none existed.

The court also held that if the question were an open one its conclusion would be the same; that the declaration of the act, that the stock which the city was to receive from the railroad company should remain "forever pledged for the redemption of said bonds," only created a statutory pledge by way of collateral security for their payment, and did not release the city from its primary liability, and that the bondholder was not bound to look to that security, but could proceed directly against the city without regard to it.

The court further held that the statutes of the State restrain-

ing municipal corporations from creating any indebtedness, without providing at the same time for the payment of the principal and interest, were not limitations upon the power of the legislature to authorize the creation of debts by such corporations upon other conditions; and though as a general rule it was deemed expedient to prohibit cities from incurring debts on their own motion, without making provision for their payment, it did not follow that the legislature might not authorize the incurring of a particular obligation without such provision; and, in the instance mentioned, the statute prescribed the details of the ordinance to be passed by the city in execution of the authority conferred.

The views thus expressed dispose of the objections to the *mandamus* in this case, founded upon what is contained in the railroad act as well as what is omitted from it. Nothing new has been presented to our consideration to lead us to doubt the correctness of our conclusions. There is no occasion, therefore, to repeat the reasons upon which they were founded.

But counsel also urge in their argument against the granting of the *mandamus*, that the power of a city to levy a tax upon property for all purposes, judgments included, is limited by acts of the legislature to one dollar and fifty cents on every one hundred dollars of valuation, and that the amount thus raised is insufficient to meet the current expenses of the city and pay previous judgments of other parties. They repeat the averments of the answer, that there was no contingent fund of the city out of which the judgment of the relator could be paid, nor moneys to the credit of the fund for current expenses not otherwise appropriated. They cite the charter of 1870, which requires a budget to be made in December of each year, exhibiting the various items of liability and expenditure for the ensuing year, and the act of March 6, 1876, which limits the right of taxation upon property by the city to one dollar and fifty cents on every one hundred dollars of its assessed value. They also insist that the conditions on which judgments against the city are to be paid are prescribed in Act No. 5 of the extra session of 1870.

This last act provides that no writ of execution or *fieri facias* shall issue from any of the courts of the State to enforce the

payment of any judgment for money against the city of New Orleans; but that such judgment, when the same shall have become executory, shall have the effect of fixing the amount of the plaintiff's demand, and that he may cause a certified copy of it, with his petition and the defendant's answer, and the clerk's certificate that it has become executory, to be filed in the office of the controller of the city, and that thereupon it shall be the duty of the controller or auditing officer to cause the same to be registered and to issue a warrant upon the treasurer or disbursing officer of the corporation for the amount, without any special appropriation of money therefor, "provided always that there be sufficient money in the treasury to pay such judgment, specially designated and set apart for that purpose in the annual budget or detailed statement of items of liability and expenditure required to be made" by sect. 124 of the act of March 20, 1856, amending the city charter, or by subsequent legislation.

The act further provides that in case the amount designated in the annual budget for the payment of judgments against the city shall have been exhausted, the "common council shall have power, *if they deem it proper*, to appropriate from the money set apart in the budget or annual estimate for contingent expenses, a sufficient sum of money to pay said judgment or judgments, but if no such appropriation be made by the common council, then all judgments shall be paid, in the order in which they shall be filed and registered in the office of controller, from the first money *next annually set apart for that purpose.*"

The respondents contend that, under these provisions, no judgment creditor can claim that his judgment shall be paid absolutely, for its payment is made to depend upon the conditions stated; or insist upon an appropriation in the budget for any fixed sum, for this is controlled by the limit of taxation and the amount of necessary expenditures to sustain the government of the city. The amount for judgments to be provided annually, they say, is to be fixed by the discretion of the common council in framing the budget; and this discretion is to be guided by the limit of taxation for all purposes, and the amount required for police, lights, paving streets, public schools, and

other necessary expenses of the city. These expenditures have heretofore exhausted, and, if the limit of taxation prescribed by the act of March 6, 1876, be enforced, will hereafter continue to exhaust, nearly all the funds raised. The balance remaining is, and, with that limit of taxation, always will be, insufficient to pay any considerable portion of the earliest judgments against the city. So the relator must wait for an indefinite period, — perhaps until the statute has barred her claim, — and take the uncertain chance of obtaining from the city in the distant future any portion of the sum due to her.

The act of March 6, 1876, giving effect to what is known as the "*premium bond plan*," does not hold out to the bondholder the delusive hope of payment in the distant future, which flitters around Act No. 5 of 1870 ; it cuts him off absolutely, unless he will accept the conditions of the proposed plan. It recites in its preamble that the total debt of the city, bonded and floating, exceeds $23,000,000 ; that the taxable property of the city has become so reduced in value as to require a tax at the rate of at least five per cent per annum to liquidate the debt ; that a tax so exorbitant will render its collection impossible ; that the continuation of a tax beyond the ability of the property to pay would lead to a further destruction of the assessable property of the city and to ultimate bankruptcy; and that the city has adopted a plan for the liquidation of its indebtedness, looking to the payment of its creditors in full, " obtaining thereby the indulgence necessary for the public well-being and the maintenance of the public honor."

The plan proposed was an exchange of outstanding bonds for premium bonds ; the latter to be of the denomination of twenty dollars each, bearing five per cent interest from July 15, 1875, payable at no designated period, the interest and principal to be paid at the same time and not separately, and the maturity of the bonds — principal and interest — to be determined by chance in the drawing of a lottery. One million of these bonds is to be divided into ten thousand series of one hundred bonds each. The ten thousand series are to be placed in a wheel, and, in April and October of each year, as many series are to be drawn as are to be redeemed, according to a certain schedule

adopted. The bonds composing the series thus drawn are to be entered for payment three months thereafter, principal and interest, and are to be receivable for all taxes, licenses, and other obligations of the city. At the expiration of the three months the bond numbers of the drawn series are to be placed in a wheel and 1,176 prizes, amounting to $50,000, are to be drawn and distributed. Under this plan the city is released from payment of the principal or interest of its debt, except such portion as may be drawn from the lottery each year. As justly observed by counsel in one of the cases before us, under this arrangement, whether a creditor will be paid in one or in fifty years, will depend upon the turn of a wheel and the drawing of a lucky number. Of course this plan disregards all the terms upon which the outstanding bonds of the city — and, among others, those held by the relator — were issued, and postpones indefinitely the payment of both their principal and interest. To induce its adoption by the city's creditors, the act, in its seventh section, provides that no tax for the payment of the principal or interest of other than the premium bonds shall thereafter be levied; repeals all laws requiring or authorizing the city to pay any such tax, and declares that it shall be incompetent for any court to issue a *mandamus* to the officers of the city to levy and collect any interest tax other than on the premium bonds.

For the interest on the premium bonds and other purposes of the city, the act provides that a tax of only one and one-half per cent per annum shall be levied; and this limitation of the taxable power of the corporation is " declared to be a contract not only with the holder of said premium bonds, but also with all residents and taxpayers of said city, so as to authorize any holder of said premium bonds to legally object to any rate of taxation in excess of the rate herein limited."

It is plain that if the provisions of this act can be sustained as a valid exercise of legislative power, the judgment of the relator is practically annulled or rendered so uncertain of payment as to be of little value.

When the bonds were issued, upon which the judgment was recovered, the city was by its charter invested with " all the powers, rights, privileges, and immunities incident to a munici-

pal corporation and necessary for the proper government of the same; " and it could have provided the means, by taxation, for their payment when they became due.   As we said in the case already cited, "the power of taxation is an incident to such a corporation, and may be exercised for all the purposes authorized by its charter or subsequent legislation.   Whatever the legislature empowers the corporation to do is presumably for its benefit, and may, in 'the proper government of the same,' be done."   Besides the power thus existing at the time the bonds were issued, the act providing for their issue directed, as already stated, a special tax to be levied each year to meet the annual interest on them.   Such being the case, the question is, whether the city has been divested of its power by the act of 1876, which we have mentioned.

The argument in support of the act is substantially this : that the taxing power belongs exclusively to the legislative department of the government, and when delegated to a municipal corporation may, equally with other powers of the corporation, be revoked or restricted at the pleasure of the legislature.

It is true that the power of taxation belongs exclusively to the legislative department, and that the legislature may at any time restrict or revoke at its pleasure any of the powers of a municipal corporation, including, among others, that of taxation, subject, however, to this qualification, which attends all State legislation, that its action in that respect shall not conflict with the prohibitions of the Constitution of the United States, and, among other things, shall not operate directly upon contracts of the corporation, so as to impair their obligation by abrogating or lessening the means of their enforcement.   Legislation producing this latter result, not indirectly as a consequence of legitimate measures taken, as will sometimes happen, but directly by operating upon those means, is prohibited by the Constitution, and must be disregarded — treated as if never enacted — by all courts recognizing the Constitution, as the paramount law of the land.   This doctrine has been repeatedly asserted by this court when attempts have been made to limit the power of taxation of a municipal body, upon the faith of which contracts have been made, and by means of which alone

they could be performed. So long as the corporation continues in existence, the court has said that the control of the legislature over the power of taxation delegated to it is restrained to cases where such control does not impair the obligation of contracts made upon a pledge, expressly or impliedly given, that the power should be exercised for their fulfilment. However great the control of the legislature over the corporation while it is in existence, it must be exercised in subordination to the principle which secures the inviolability of contracts.

The case of *Von Hoffman* v. *City of Quincy*, reported in 4th Wallace, is a leading one on this subject. There the legislature of Illinois had in 1851, 1853, and 1857 passed acts authorizing that city to subscribe for stock of certain railroad companies, and in payment thereof to issue its bonds with coupons for interest annexed. Those acts authorized the city to levy a special annual tax upon the property therein, real and personal, to pay the annual interest upon the bonds, and required that the tax when collected should be set aside as a special fund for that purpose. The city failed to pay the coupons held by the relator for a long time after they became due, and refused to levy the tax necessary for that purpose. The relator thereupon sued the city and recovered judgment. Execution issued thereon being returned unsatisfied, he applied to the Circuit Court of the United States for the Southern District of Illinois for a *mandamus* to compel the authorities of the city to apply to the payment of the judgment any unappropriated funds they had, or, if they had no such funds, to levy a tax under the acts mentioned sufficient for that purpose. The court issued an alternative writ, to which the city authorities answered setting up an act of the legislature of the State, of November, 1863, authorizing the city council to levy a tax for certain special purposes, such as lighting the streets and erecting buildings for schools, and also a tax on all real and personal property to pay the debts and meet the general expenses of the city not exceeding fifty cents on each one hundred dollars of the annual assessed value thereof, and repealing all other laws touching taxes except such as related to their collection, or to streets, alleys, and licenses. And they alleged that the full

amount of taxes thus authorized was in process of collection; that the power of the city in that respect was exhausted; and that the fifty cents on the one hundred dollars when collected would not be sufficient to pay the annual expenses for the year 1864, and the debts of the city. The relator demurred to the answer, and judgment was given against him; but the case being brought to this court, the judgment was reversed. In delivering the unanimous opinion of the court, Mr. Justice Swayne said: —

" It is well settled that a State may disable itself by contract from exercising its taxing power in particular cases. It is equally clear that where a State has authorized a municipal corporation to contract, and to exercise the power of local taxation to the extent necessary to meet its engagements, the power thus given cannot be withdrawn until the contract is satisfied. The State, and the corporation, in such cases, are equally bound. The power given becomes a trust which the donor cannot annul, and which the donee is bound to execute; and neither the State nor the corporation can any more impair the obligation of the contract in this way than in any other. The laws requiring taxes to the requisite amount to be collected, in force when the bonds were issued, are still in force for all the purposes of this case. The act of 1863 is, so far as it affects these bonds, a nullity. It is the duty of the city to impose and collect the taxes in all respects as if that act had not been passed. A different result would leave nothing of the contract, but an abstract right, — of no practical value, — and render the protection of the Constitution a shadow and a delusion." 4 Wall. 535, 554.

The prohibition of the Constitution against the passage of laws impairing the obligation of contracts applies to the contracts of the State, and to those of its agents acting under its authority, as well as to contracts between individuals. And that obligation is impaired, in the sense of the Constitution, when the means by which a contract at the time of its execution could be enforced, that is, by which the parties could be *obliged* to perform it, are rendered less efficacious by legislation operating directly upon those means. As observed by the court in the case cited, "without the remedy the contract may

indeed, in the sense of the law, be said not to exist, and its obligation to fall within the class of those moral and social duties which depend for their fulfilment wholly upon the will of the individual. The ideas of validity and remedy are inseparable, and both are parts of the obligation which is guaranteed by the Constitution. The obligation of a contract 'is the law which binds the parties to perform their agreement.' "

The restraint upon the legislature, to the extent mentioned, by the contract clause of the Constitution, against revoking or limiting the power of taxation delegated by it to municipal bodies as the means of carrying out the purposes of their incorporation or purposes designed for their benefit, is a different matter from that of exempting property from taxation; and even in the latter case it has been adjudged in repeated instances that one legislature can bind its successors. The restraint in no respect impairs the taxing power of the existing legislature or of its successors, or removes any property from its reach.

These views are not inconsistent with the doctrine declared by the decision of the court in the recent case of *Meriwether* v. *Garrett*, 102 U. S. 472. There the charter of the city of Memphis had been repealed, and the State had taken the control and custody of her public property, and assumed the collection of the taxes previously levied, and their application to the payment of her indebtedness. The city with all her officers having thus gone out of existence, there was no organization left — no machinery — upon which the courts could act by *mandamus* for the enforcement of her obligations to creditors. The question considered, therefore, was whether the taxes levied before the repeal of the charter, but not paid, were assets which the court could collect through a receiver and apply upon judgments against the city.

Here, the municipal body that created the obligations upon which the judgment of the relator was recovered, existing with her organization complete, having officers for the assessment and collection of taxes, there are parties upon whom the courts can act. The courts, therefore, treating as invalid and void the legislation abrogating or restricting the power of taxation

delegated to the municipality, upon the faith of which contracts were made with her, and upon the continuance of which alone they can be enforced, can proceed and by *mandamus* compel, at the instance of parties interested, the exercise of that power as if no such legislation had ever been attempted. And that the relator seeks to have done here.

Following the doctrine of *Von Hoffman* v. *City of Quincy*, we are of opinion that the act of March 6, 1876, the provisions of which we have stated, is invalid so far as it limits the power which the city possessed, when the bonds upon which the relator has recovered judgment were issued, to levy a tax for their payment. In thus limiting the power without providing other adequate means of payment of the bonds, the legislature has impaired the obligation of the contract between her and the city.

The judgment of the court below must, therefore, be reversed, and the cause remanded with directions to issue the writ as prayed in the petition of the relator; and it is

*So ordered.*

MR. JUSTICE HARLAN. I concur in the opinion just delivered, except the paragraph in which reference is made to *Meriwether* v. *Garrett*, 102 U. S. 472. The present case does not require us to determine any question as to the effect which the repeal of a municipal charter may have upon the rights of existing creditors. Nor do I wish to be understood as assenting to the correctness of the statement in the opinion as to what was involved and decided in *Meriwether* v. *Garrett*.