[No. S018200. May 4, 1992.]

SAN FRANCISCO TAXPAYERS ASSOCIATION, Plaintiff and
Respondent, v.
BOARD OF SUPERVISORS OF THE CITY AND COUNTY OF SAN
FRANCISCO, Defendant and Appellant.

COUNSEL

Louise H. Renne, City Attorney, Burke E. DeLeventhal and Thomas J. Owen, Deputy City Attorneys, for Defendant and Appellant.

Ronald A. Zumbrun, Anthony T. Caso and Jonathan M. Coupal for Plaintiff and Respondent.

OPINION

PANELLI, J.—California's voters, by adopting Proposition 4, placed a constitutional spending limit on appropriations by the state and local governments. (See Cal. Const., art. XIII B, § 1, added by initiative measure in

Special Statewide Elec. (Nov. 6, 1979).) The measure sets out, for the purpose of calculating each governmental entity's spending limit, those categories of appropriations that are and are not subject to limitation. We granted review to decide which of the measure's provisions determines the treatment of a city's contributions to employee retirement funds that were established before Proposition 4 took effect. Section 5[1] provides that appropriations to "retirement" funds are "subject to limitation." Section 9 provides that appropriations for "debt service" are not. In accordance with the plain language of section 5, the more specific provision, we hold that retirement contributions are subject to limitation.

## BACKGROUND

The electorate approved Proposition 4 in 1979, thus adding article XIII B to the state Constitution. While the earlier Proposition 13 limited the state and local governments' power to increase taxes (see Cal. Const., art. XIII A, added by initiative measure in Primary Elec. (June 6, 1978)), Proposition 4, the so-called "Spirit of 13," imposed a complementary limit on the rate of growth in governmental spending. Article XIII B operates by subjecting each state and local governmental entity's appropriations to a limit equal to the entity's appropriations in the prior year, adjusted for changes in population and the cost of living. (§§ 1, 8, subds. (e), (f).)

Not all appropriations are subject to the constitutional spending limit. In general, " '[a]ppropriations subject to limitation' " include "any authorization to expend during a fiscal year the proceeds of taxes levied by or for that entity and the proceeds of state subventions to that entity . . . ." (§ 8, subd. (b) [applicable to local governments].) However, the voters specifically excluded some categories of appropriations from the spending limit. Section 9, for example, permits appropriations beyond the limit for "[d]ebt service" and to "comply[] with mandates of the courts or the federal government . . . ." (§ 9, subds. (a), (b).) Conversely, the voters specifically determined that the spending limit would apply to other types of appropriations. The provision at issue in this case, section 5, declares that contributions to a "retirement" fund are "subject to limitation."

Article XIII B took effect during the 1980-1981 fiscal year. Pursuant to its provisions, defendant and appellant Board of Supervisors (Board) of the City

---

[1]All further references to section numbers, unless otherwise noted, are to sections of article XIII B of the California Constitution.

and County of San Francisco (City) established an appropriations limit that included the City's contributions to retirement funds. The Board continued to treat such contributions as subject to the spending limit for six consecutive fiscal years.

The Board changed its historical position in 1986. That year, the City Attorney advised the Board that appropriations for certain "mandatory employee benefits," including retirement contributions, were exempt from the spending limit as "debt service" under section 9.[2] Adopting that position, the Board revised the City's base-year spending limit by subtracting $59,388,698, which represented the amount of the City's appropriations for such benefits in the year the voters approved Proposition 4. The Board derived the 1986-1987 spending limit by adjusting the revised base-year limit to reflect intervening increases in population and the cost of living. (See § 1.) Each subsequent fiscal year's spending limit has excluded retirement contributions.

In September 1987, a decision of the Court of Appeal cast doubt on the City Attorney's interpretation of article XIII B. The County of Santa Barbara, like the City of San Francisco, had decided several years after Proposition 4 to exclude retirement contributions from its spending limit as "debt service." The Second District Court of Appeal rejected the county's position, holding that "the plain language of section 5 requires the inclusion of such contributions as appropriations subject to the appropriations limit" and that the more specific language of section 5 takes precedence over section 9, the more general provision governing debt service. (*Santa Barbara County Taxpayers Assn.* v. *County of Santa Barbara* (1987) 194 Cal.App.3d 674, 678 [239 Cal.Rptr. 769] [hereafter *Santa Barbara Taxpayers*].) We denied a petition for review in that case on November 18, 1987.

In calculating the City's spending limit for the 1988-1989 fiscal year, the Board recognized that its exclusion of retirement contributions was inconsistent with the *Santa Barbara Taxpayers* decision. Even without the benefit of the exclusion, the City's projected "appropriations subject to limitation" did not exceed its annual spending limit. However, based on the City Attorney's advice that the Court of Appeal's opinion was "wrongly decided" the Board determined to continue to exclude retirement contributions.

---

[2] The Board also excluded appropriations for certain other employee benefits, including contributions to the health service and social security systems. Only the treatment of retirement contributions is at issue in this case.

The consequence of the Board's decision was to increase by $40,336,171 the total amount ($97,640,070) by which the City's spending limit exceeded its appropriations subject to limitation in the 1988-1989 fiscal year.[3] However, based on the City Attorney's opinion that the decision would "entail time consuming and difficult litigation," the City Controller recommended that the Board not "collect or appropriate revenues based upon [the $40 million] spread until the impact of the *Santa Barbara [Taxpayers]* decision on the City of San Francisco has been clarified."

In December 1988, plaintiff and respondent San Francisco Taxpayers Association (hereafter Taxpayers) initiated this action to challenge the Board's exclusion of retirement contributions from the City's spending limit. Taxpayers alleged that the Board's action violated section 5, which provides that "contributions" to "retirement" funds are "subject to limitation." Following the Second District's decision in *Santa Barbara Taxpayers* (*supra*, 194 Cal.App.3d 674), the superior court granted Taxpayers' motion for summary judgment and entered judgment against the Board. In its judgment, the court declared the Board's action invalid and ordered the Board, by injunction and writ of mandate, to revise the City's appropriations limit to include retirement contributions. On appeal, the First District declined to follow *Santa Barbara Taxpayers* and reversed the judgment. We granted review to resolve the conflict.

## DISCUSSION

The question before us is whether section 5 or section 9 governs the treatment of retirement contributions for the purpose of calculating the City's spending limit. Section 5 expressly provides that a governmental entity's contributions to "retirement" funds are "subject to limitation."[4]

---

[3]The $40,336,171 amount represents the effect of excluding "mandatory employee benefits" (see fn. 2, *ante*), which include retirement contributions, from both the base-year limit *and* the 1988-1989 limit. In other words, $40,336,171 is the amount by which the City's appropriations for "mandatory employee benefits" grew, between the base year and 1988-1989, in excess of the permissible rate of growth set out article XIII B.

[4]Section 5 provides: "Each entity of government may establish such contingency, emergency, unemployment, reserve, *retirement*, sinking fund, trust, or similar funds as it shall deem reasonable and proper. *Contributions to any such fund, to the extent that such contributions are derived from the proceeds of taxes, shall for purposes of this Article constitute appropriations subject to limitation in the year of contribution.* Neither withdrawals from any such fund, nor expenditures of (or authorizations to expend) such withdrawals, nor transfers between or among such funds, shall for purposes of this Article constitute appropriations subject to limitation." (Italics added.)

Section 9, which does not mention retirement contributions, provides that appropriations for "debt service" are not subject to limitation.[5]

Ordinary principles of interpretation point to the conclusion that section 5, the more specific provision, governs. ■ "It is well settled . . . that a general provision is controlled by one that is special, the latter being treated as an exception to the former. A specific provision relating to a particular subject will govern in respect to that subject, as against a general provision, although the latter, standing alone, would be broad enough to include the subject to which the more particular provision relates." (*Rose* v. *State of California* (1942) 19 Cal.2d 713, 723-724 [123 P.2d 505].) ■ Thus, even if we were to assume for argument's sake that the term "debt service" (§§ 8(g), 9(a)) might be broad enough to include retirement contributions, the treatment of such contributions is nevertheless governed by the voters' specific declaration that they are "subject to limitation." (§ 5.) This was the correct conclusion of the Court of Appeal in *Santa Barbara Taxpayers* (*supra*, 194 Cal.App.3d at pp. 681-682).[6]

The Board does not view this case as an example of a specific provision taking precedence over a general provision. Instead, the Board argues that sections 5 and 9(a) conflict and that we should "harmonize" them by giving effect to both so far as possible. (Cf. *Lungren* v. *Deukmejian* (1988) 45 Cal.3d 727, 735 [248 Cal.Rptr. 115, 755 P.2d 299]; *Dyna-Med, Inc.* v. *Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1387 [241 Cal.Rptr. 67, 743 P.2d 1323].) The Board would achieve harmony by distinguishing between payments required by pension contracts, on one hand, and discretionary payments to reserve funds, on the other. As the Board would interpret the law, required payments constitute debt service while discretionary payments do not.

Two flaws render the Board's argument untenable. First, there is no conflict between sections 5 and 9(a) unless one assumes that the voters did not mean what they said in section 5—that "retirement" contributions are "subject to limitation." Read according to its plain meaning, section 5 creates an exception to section 9(a) rather than a conflict.

[5]Section 9, subdivision (a) (hereafter section 9(a)), provides: " 'Appropriations subject to limitation' . . . do not include . . . Appropriations for *debt service*." (Italics added.)

Section 8, subdivision (g) (hereafter section 8(g)), provides: " '*Debt service*' means appropriations required to pay the cost of interest and redemption charges, including the funding of any reserve or sinking fund required in connection therewith, on indebtedness existing or legally authorized as of January 1, 1979, or on bonded indebtedness thereafter approved according to law by a vote of the electors of the issuing entity voting in an election for that purpose." (Italics added.)

[6]The Legislature has similarly concluded that the state's retirement contributions are subject to limitation. (See 1991-1992 Budget, Stats. 1991, ch. 118, § 3.60, subd. (c).)

Second, the Board's argument would permit the City to evade section 5 completely, simply by satisfying its contractual obligations. According to the Board, so long as the City does not employ reserve funds for its own convenience its retirement contributions will never become subject to limitation. The voters could not reasonably have intended such a result, which would in effect nullify their express declaration that retirement contributions are subject to limitation. Such an interpretation is obviously to be avoided. (See, e.g., *Lungren* v. *Deukmejian, supra,* 45 Cal.3d at p. 735; *People* v. *Craft* (1986) 41 Cal.3d 554, 561 [224 Cal.Rptr. 626, 715 P.2d 585].) In contrast, to give full effect to section 5 does not nullify section 9(a), which continues to apply to a wide variety of other obligations.

The Board offers several additional arguments against this conclusion. None is persuasive.

First, the Board argues that retirement contributions must be treated as debt service in order to achieve consistency with article XIII A. Article XIII A limits the maximum rate of ad valorem taxes on real property but permits taxes in excess of that rate to repay certain voter-approved indebtedness.[7] In *Carman* v. *Alvord* (1982) 31 Cal.3d 318, 324-333 [182 Cal.Rptr. 506, 644 P.2d 192] (*Carman*), we held that article XIII A's exemption for "indebtedness" was broad enough to include a city's retirement obligations. Thus, a city may levy taxes in excess of the maximum rate to satisfy such obligations. (*Ibid.*)

Because articles XIII A and XIII B address the treatment of indebtedness in similar language, the Board argues that retirement contributions cannot be debt service under the former (see *Carman, supra,* 31 Cal.3d 318) but not under the latter. The argument, however, ignores both the reasoning of *Carman* and the language of article XIII B. Our conclusion in *Carman* that retirement obligations constituted "indebtedness" was expressly based on article XIII A's failure to articulate a distinction for retirement contributions. (*Carman, supra,* 31 Cal.3d at p. 330.) In contrast, article XIII B does articulate a distinction between retirement contributions and other obligations. (§ 5.) Article XIII B also provides that its definition of "debt service" applies only in the context of that article and is subject to exceptions as "expressly provided" therein. (§ 8.) As already discussed, the specific provision governing retirement contributions (§ 5) must be viewed as an

---

[7]Specifically, the maximum tax rate does not apply "to ad valorem taxes or special assessments to pay the interest and redemption charges on (1) any indebtedness approved by the voters prior to July 1, 1978, or (2) any bonded indebtedness for the acquisition or improvement of real property approved on or after July 1, 1978, by two-thirds of the votes cast by the voters voting on the proposition." (Cal. Const., art. XIII A, § 1, subd. (b).)

exception to the more general provisions governing debt service (§§ 8(g), 9(a)).

The Board's argument for "consistent" interpretations of articles XIII A and XIII B is not based solely on similarities in language. It would also be "meaningless," according to the Board, to permit the City to raise taxes to satisfy retirement obligations while denying it the power to spend the resulting revenues. However, the argument misconceives the purpose of subjecting retirement contributions to the overall spending limit. The purpose is not to prevent the City from satisfying its contractual obligations but simply to control the overall rate of growth in appropriations, if necessary by reducing other spending. Indeed, each year's spending limit reflects the fact that the City made retirement contributions in the prior year and the assumption that it will continue to do so. (See §§ 1, 5.) In contrast, to exclude a category of appropriations from the spending limit would in effect remove that category from the budget, permitting both it and overall spending to increase faster than the rate that the voters adopted as the measure of acceptable growth. (§ 1.)

The relationship between the *Carman* rule and the treatment of retirement contributions under article XIII B must be understood in this light. *Carman* permits the City to pass through directly to the voters the cost of any retirement contributions, regardless of the maximum tax rate set out in article XIII A. Unless such contributions are subject to the spending limit set out in article XIII B, as the voters expressly provided (§ 5), one of the largest categories of local governmental spending[8] would be completely insulated from fiscal control. The result would be a material impairment of article XIII B's effectiveness in limiting the overall growth of appropriations.

The Board finds support for its contrary interpretation of article XIII B in a remark by the Legislative Analyst. In his report on the proposed measure, the Legislative Analyst concluded that "a local government with an unfunded liability in its retirement system could appropriate its excess revenues to reduce the liability, as such an appropriation would be considered a payment toward a legal 'indebtedness' under this ballot measure." (Ballot Pamp., Special Statewide Elec. (Nov. 6, 1979) p. 20.) ▮ In this case, as always, we consider the Legislative Analyst's views because we assume the voters considered them along with the other materials in the ballot pamphlet. (See, e.g., *Raven* v. *Deukmejian* (1990) 52 Cal.3d 336, 349 [276 Cal.Rptr. 326, 801 P.2d 1077].)

---

[8]The City, in its Comprehensive Annual Financial Report for the year ended June 30, 1988, reported retirement contributions of approximately $240 million. The City's appropriations limit for that year, which excluded retirement contributions, was approximately $700 million.

Nevertheless, a nonjudicial interpretation of the Constitution is entitled only to as much deference as its logic and persuasiveness demand. ▮ In this case, the Legislative Analyst's views are not persuasive because there is no indication that they take into account the most directly relevant provision, section 5.

▮ The Legislative Analyst's comment regarding the treatment of retirement contributions is based on a memorandum to him from the Legislative Counsel dated June 15, 1979. In the memorandum, the Legislative Counsel concludes that "any legally binding obligation existing or legally authorized as of January 1, 1979, would be considered as 'indebtedness' for purposes of subdivision (g) of Section 8" and that "such a legally binding obligation would include the unfunded liability of a public employee retirement system." However, the memorandum does not mention or consider the effect of section 5, which expressly contradicts the memorandum's conclusion. In the Ballot Pamphlet, the Legislative Analyst merely repeated the Legislative Counsel's conclusion, again without any consideration of section 5.

The Legislative Analyst's comments, like other materials presented to the voters, "may be helpful but are not conclusive in determining the probable meaning of initiative language." (*Carman, supra*, 31 Cal.3d at p. 330.) Thus, when other statements in the election materials contradict the Legislative Analyst's comments we do not automatically assume that the latter accurately reflects the voters' understanding. (*Id.*, at pp. 330-331.) In *Carman*, for example, the official title and summary of Proposition 13 led us to reject the Legislative Analyst's conclusion that the measure's exemption from the maximum tax rate for voter-approved indebtedness applied only to bonded debt. (*Ibid.*) ▮ The case for rejecting the Legislative Analyst's views is even more compelling here, where the contradiction is in the language of the initiative. (§ 5.) Under circumstances such as these, to prefer an "extrinsic source" over "a clear statement in the Constitution itself" would be "a strained approach to constitutional analysis." (Cf. *Delaney v. Superior Court* (1990) 50 Cal.3d 785, 802-803 [268 Cal.Rptr. 753, 789 P.2d 934] [rejecting, as contrary to the language of the proposed measure, the Legislative Analyst's inference that the newsperson's shield law would apply only to confidential information].)

▮ The Board's final argument for interpreting article XIII B to exclude retirement contributions is that such an interpretation will "eliminate doubts" as to the measure's constitutionality. According to the Board, to restrict the City's spending power impairs the security of its pension obligations and, thus, constitutes a "potential" violation of the contract clause of

the federal Constitution.[9] The Board expressly disclaims any intent to assert a cause of action or to raise an affirmative defense under the clause. "Rather," to quote the Board's brief, "the City has raised the potential impairment of contracts to explain and support its choice among competing interpretations of Article XIII B."

Taxpayers contend that the Board lacks standing to make the constitutional argument for two reasons. First, as a creation of the state, the City may not invoke the contract clause "in opposition to the will of [its] creator." (*Coleman* v. *Miller* (1939) 307 U.S. 433, 441 [83 L.Ed. 1385, 1390, 59 S.Ct. 972, 122 A.L.R. 695]; see also *Williams* v. *Mayor* (1933) 289 U.S. 36, 40 [77 L.Ed. 1015, 1020, 53 S.Ct. 431]; *State of California* v. *Marin Mun. W. Dist.* (1941) 17 Cal.2d 699, 705 [111 P.2d 651]; *Cox Cable San Diego, Inc.* v. *City of San Diego* (1987) 188 Cal.App.3d 952, 967 [233 Cal.Rptr. 735].) Second, any impairment of the City's retirement obligations would cause actual harm only to those persons entitled to receive retirement benefits. (See *Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization* (1978) 22 Cal.3d 208, 242 [149 Cal.Rptr. 239, 583 P.2d 1281] [in dictum].)

These arguments about the Board's standing are irrelevant because the Board is not challenging article XIII B's validity under the contract clause. Instead, we are called upon to decide what the article means. ■ In doing so, we assume that the voters intended the measure to be valid and construe it to avoid "serious" doubts as to its constitutionality if that can be done "without doing violence to the reasonable meaning of the language." (*Miller* v. *Municipal Court* (1943) 22 Cal.2d 818, 828 [142 P.2d 297]; see also *Gollust* v. *Mendell* (1991) __ U.S. __ [115 L.Ed.2d 109, 111 S.Ct. 2173, 2181]; *Crowell* v. *Benson* (1932) 285 U.S. 22, 62 [76 L.Ed. 598, 619, 52 S.Ct. 285].) ■ These well established rules provide us with ample warrant to consider the Board's argument about how the contract clause should affect our interpretation of article XIII B.

We turn, then, to the argument's merits. In essence, the Board contends that the City's power to spend is the security for its pension obligations and that any restriction of the power *ipso facto* reduces the value of its employees' pension rights. This reduction in value, according to the Board, constitutes a "potential" impairment of the City's contractual obligations.

To establish this point on summary judgment, the Board submitted declarations in which experts applied techniques of financial analysis to predict

---

[9]"No state shall . . . pass any . . . law impairing the obligation of contracts . . . ." (U.S. Const., art. I, § 10, cl. 1.)

the effect of a spending limit on the hypothetical market value of an employee's interest in retirement benefits. The trial court sustained objections to these declarations on relevance grounds. Even without such declarations, however, we may assume for argument's sake, as do the parties, that a spending limit has at least a theoretical effect on the security of the City's retirement obligations. In the Board's view, "an impairment occurs when the State changes the law so as to erode the ability of the City to perform, whether a breach necessarily follows or not."[10]

The Board relies, by analogy, on cases in which the high court refused to enforce state laws that purported to disable cities from levying taxes to repay municipal bonds. (See, e.g., *Wolff* v. *New Orleans* (1881) 103 U.S. 358, 365-369 [26 L.Ed. 395, 398-399]; *Von Hoffman* v. *City of Quincy* (1867) 71 U.S. 535, 554-555 [18 L.Ed. 403, 410].) These cases stand for the proposition that a state may not authorize a city to contract and then restrict its taxing power so that it cannot fulfill its obligations.[11] (*Wolff* v. *New Orleans, supra*, 103 U.S. at pp. 367-369 [26 L.Ed. at pp. 399-400]; *Von Hoffman* v. *City of Quincy, supra*, 71 U.S. at pp. 554-555 [18 L.Ed. at p. 410]; cf. *United States Trust Co.* v. *New Jersey* (1977) 431 U.S. 1, 24, fn. 22 [52 L.Ed.2d 92, 111, 97 S.Ct. 1505 ].) Underlying such decisions, at least implicitly, is the idea that "[t]he principal asset of a municipality is its taxing power" and that "[a]n unsecured municipal security is therefore merely a draft on the good faith of a municipality in exercising its taxing power." (*Faitoute Co.* v. *Asbury Park* (1942) 316 U.S. 502, 509 [86 L.Ed. 1629, 1635, 62 S.Ct. 1129]; cf. *Von Hoffman* v. *City of Quincy, supra*, 71 U.S. at p. 555 [18 L.Ed. at p. 410].)

By analogy to these cases, the Board argues that the contract clause would also invalidate a state law purporting to disable a municipality from spending money to satisfy its contractual obligations. While there is support for the proposition, the relevant cases involve statutes specifically enacted for the purpose of repudiating particular contractual duties rather than laws imposing budgetary restrictions. In *United States Trust Co.* v. *New Jersey* (*supra*, 431 U.S. 1, 17-28 [52 L.Ed.2d 92, 106-113]) the high court declared unenforceable a statute intended to abrogate a port authority's express covenant to its bondholders not to make unauthorized expenditures out of revenues designated for repayment of the bonds. Similarly, in *Valdes* v. *Cory* ((1983) 139 Cal.App.3d 773, 789-791 [189 Cal.Rptr. 212]), the Court of Appeal ordered the state Controller and other public employers to make

---

[10]Because the Board's argument is so broad, and because the Board expressly disclaims any intent to assert a cause of action or defense under the contract clause, there is no need to remand for additional evidentiary proceedings.

[11]We rejected a similar challenge to article XIII A as premature in *Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization, supra*, 22 Cal.3d at pages 238-242.

periodic payments to the Public Employees' Retirement Fund despite legislation intended to abrogate the underlying contractual and statutory duties.

Unlike the laws at issue in the cited cases, article XIII B does not repudiate, or even modify, any contractual right or obligation.[12] Article XIII B can more accurately be said to bring retirement obligations under the umbrella of an overall spending limit, but even this limited statement is an oversimplification. In fact, other provisions of the law provide substantial protection for retirement obligations, even in the face of budgetary competition. Specifically, the City has mandatory duties to make periodic payments to its retirement funds in amounts sufficient to keep the funds actuarially sound (Gov. Code, §§ 20741 et seq. [contributions to Public Employees' Retirement Fund], 45341 et seq. [contributions to single-employer plans]; see generally *Valdes* v. *Cory*, *supra*, 139 Cal.App.3d 773); and article XIII A permits the City to recover the cost of such contributions without regard to the constitutional maximum tax rate. (See *Carman*, *supra*, 31 Cal.3d 318.)

Nor does article XIII B provide a strong incentive for a governmental entity to attempt to avoid its retirement obligations. This is because each year's spending limit reflects the prior year's retirement contributions and other appropriations, adjusted to account for the change in population and the cost of living.[13] (§§ 1, 5.) Thus, the City's high retirement costs in the base year have been reflected in subsequent years by higher and higher adjusted spending limits. Under section 11, this court's determination that retirement contributions are subject to limitation will entail a corresponding increase in the City's base-year and current spending limits. Moreover, if the voters wish to increase discretionary spending in other areas they may do so by the vote of a simple majority. (§ 4.) We note that as of March 1990, voters in 117 jurisdictions had considered proposals to increase spending limits to permit the appropriation of revenues already collected. Of these proposals, 106 were approved. (Cal. Leg., 1990 Revenue and Taxation Reference Book, at p. 196 (1990).)

While it can be argued that any budget entails a theoretical reduction in the security of the budgeted obligations, more is required to establish a serious doubt as to a law's validity under the contract clause. Particularly in

---

[12]For this reason, the rule that " 'alterations of employees' pension rights must bear some material relation to the theory of a pension system and its successful operation' " (*Miller* v. *State of California* (1977) 18 Cal.3d 808, 816 [135 Cal.Rptr. 386, 557 P.2d 970], quoting *Allen* v. *City of Long Beach* (1955) 45 Cal.2d 128, 131 [287 P.2d 765]), has no bearing on this case.

[13]Proposition 111 liberalized the definition of "cost of living," thus permitting greater annual increases to the spending limit. (See § 8, subd. (e)(2), added by initiative measure in Primary Elec. (June 5, 1990).)

this area, " '[t]he Constitution is "intended to preserve practical and substantial rights, not to maintain theories" [citation].' " (*City of El Paso* v. *Simmon* (1965) 379 U.S. 497, 515 [13 L.Ed.2d 446, 458, 85 S.Ct. 577], quoting *Faitoute Co.* v. *City of Asbury Park, supra,* 316 U.S. at p. 514 [86 L.Ed. at p. 1637].) While the contract clause "appears literally to proscribe 'any' impairment . . . 'the prohibition is not an absolute one and is not to be read with literal exactness like a mathematical formula.' " (*United States Trust Co.* v. *New Jersey, supra,* 431 U.S. at p. 21 [52 L.Ed. 2d at p. 109], quoting *Home Building & Loan Assn.* v. *Blaisdell* (1934) 290 U.S. 398, 428 [78 L.Ed. 413, 423, 54 S.Ct. 231, 88 A.L.R. 1481].)

The threshold inquiry under the contract clause is "whether the state law has, in fact, operated as a substantial impairment of a contractual relationship." (*Allied Structural Steel Co.* v. *Spannaus* (1978) 438 U.S. 234, 2441 [57 L.Ed.2d 727, 736, 98 S.Ct. 2716].) Viewing article XIII B with reference to the whole system of law of which it is a part (cf. *Bowland* v. *Municipal Court* (1976) 18 Cal.3d 479, 489 [134 Cal.Rptr. 630, 556 P.2d 1081]), it cannot fairly be said that article XIII B has operated as a substantial impairment. Its effect, rather, has been to require governmental entities to reduce the overall growth in appropriations by reducing expenditures not required by law, except where the voters have chosen to increase the spending limit. A governmental entity that decided to make discretionary appropriations in other areas rather than legally required contributions to retirement funds might well thereby violate the contract clause (*Valdes* v. *Cory, supra,* 139 Cal.App.3d 773), but it would not be acting under the aegis or compulsion of article XIII B.

While we must construe a provision to avoid serious doubts as to its constitutionality, the "avoidance of a difficulty will not be pressed to the point of disingenuous evasion." (*Moore Ice Cream Co.* v. *Rose* (1933) 289 U.S. 373, 379 [77 L.Ed. 1265, 1270, 53 S.Ct. 620].) The manifest purpose of Proposition 4 was to limit the overall growth of governmental appropriations. To remove from the spending limit such a large category of appropriations as retirement contributions would do violence to that goal. Under these circumstances, the Board's constitutional arguments do not justify a departure from the plain statement that contributions to retirement funds are subject to limitation.

DISPOSITION

The decision of the Court of Appeal is reversed.

Lucas, C. J., Arabian, J., Baxter, J., and George, J., concurred.

MOSK, J.—I dissent. The majority's holding that retirement contributions are subject to the limitation of section 1 of article XIII B of the California Constitution is based entirely on a literal reading of the language of section 5 of article XIII B (hereafter section 5) and the rule of statutory construction that a specific provision relating to a particular subject will govern over a more general provision relating to the same subject. That is, even though retirement contributions may be classified as an indebtedness under subdivision (a) of section 9 of article XIII B (hereafter section 9(a)), the majority conclude that section 5 must prevail because it refers specifically to contributions to retirement funds. In the view of the majority, the section 5 inclusion of retirement fund contributions is an exception to the general provision of section 9(a).

This holding is not only in violation of well-established rules of statutory construction, but is contrary to the intent of the voters in adopting article XIII B of the state Constitution (hereafter article XIII B). It is clear from the legislative history of that provision that the voters intended to exclude retirement contributions as an indebtedness under section 9(a). They were specifically told in the ballot pamphlet analysis by the Legislative Analyst that the government's liability to make payments into a retirement fund was an "indebtedness" under article XIII B. This statement is a persuasive indication of the intent of the voters since, as the majority recognize, it must be assumed that they considered it in voting on the measure.

The majority reject the conclusion that logically follows from the Legislative Analyst's statement. They cast doubt on its correctness because it is a "nonjudicial interpretation" of the language of article XIII B. But this may be said of any statement in the ballot pamphlet. In attempting to discern the intent of the voters, the legal persuasiveness of the analysis is not the standard; the purpose of consulting the ballot pamphlet is to determine what the voters intended, assuming, as we must, that they considered the statements made therein. The majority find the Legislative Analyst's conclusion to be unpersuasive because "there is no indication" that he considered the language of section 5 in making his analysis. But there is no reason to suppose that he informed the voters that pension contributions are an indebtedness under article XIII B without considering the other provisions of the article, including section 5. The issue is not whether he was correct in his analysis of the measure in the hindsight of a court considering the issue more than a decade after it was adopted, but the understanding of the voters as to the meaning of these provisions.

Another reason given by the majority for rejecting the Legislative Analyst's conclusion is that it contradicts section 5. But this is circular reasoning, for it assumes the answer to the question at issue. The problem posed by

this case is whether pension contributions are excluded from the spending limitation as an indebtedness under section 9(a), or whether they are included in view of the language of section 5. To conclude, as do the majority, that contributions are not an indebtedness because such a determination would be contrary to the meaning of section 5, presupposes that section 5 prevails over section 9(a). That, of course, is the very issue under consideration.

In sum, there is no escaping the fact that the voters were expressly told by the Legislative Analyst that pension contributions were exempt from the spending limitation under article XIII B. The majority, instead of accepting the fact that this was the voters' understanding and attempting to harmonize sections 5 and 9(a) in accordance with that understanding, hold that section 5 dominates, thereby disregarding the intent of the electorate.

The result reached by the majority is particularly inappropriate in the present case because sections 5 and 9(a) may be harmonized so as to give effect to both provisions. The majority disregard a rule of construction critical in the present context, i.e., that a court must attempt to reconcile provisions relating to the same subject matter to the extent possible, so as to avoid substantially nullifying the effect of any part of an enactment. (*Lungren* v. *Deukmejian* (1988) 45 Cal.3d 727, 735 [248 Cal.Rptr. 115, 755 P.2d 299]; *County of Los Angeles* v. *State of California* (1987) 43 Cal.3d 46, 58 [233 Cal.Rptr. 38, 729 P.2d 202]; *People* v. *Craft* (1986) 41 Cal.3d 554, 560 [224 Cal.Rptr. 626, 715 P.2d 585].) The holding that section 5 is an exception to section 9(a) results in practically nullifying the effect of the latter provision. According to the majority's own analysis, retirement contributions constitute "one of the largest categories of local governmental spending." Such contributions are undoubtedly indebtedness of the city, a proposition the majority accept, at least for the sake of argument. To assume that the electorate chose in section 9(a) to except all indebtedness existing on January 1, 1979, from the spending limitation,[1] but not to include within such indebtedness "one of the largest categories of governmental spending," results in a significant abrogation of section 9(a).

This consequence is particularly unwarranted in the present case because sections 5 and 9(a) may be reconciled so as to give effect to both provisions. That is, section 5 may be construed as referring to pension funds established

---

[1] Under subdivision (g) of section 8 of article XIII B (hereafter section 8(g)), "debt service" is defined as "appropriations required to pay the cost of interest and redemption charges, including the funding of any reserve or sinking fund required in connection therewith, on indebtedness existing or legally authorized as of January 1, 1979."

after January 1, 1979. Section 9(a), on the other hand, applies to funds established prior to that date to fulfill the city's obligations to meet an "indebtedness." This construction is consistent with both the language of section 5—it provides that a government entity "may establish" such funds as it "shall deem reasonable and proper," implying establishment of funds at a future time—and the general rule that constitutional provisions are applied prospectively. *(In re Marriage of Bouquet* (1976) 16 Cal.3d 583, 587 [128 Cal.Rptr. 427, 546 P.2d 1371]; *Mannheim* v. *Superior Court* (1970) 3 Cal.3d 678, 686 [91 Cal.Rptr. 585, 478 P.2d 17].)

The majority reject an alternate means offered by the Board of Supervisors for the City and County of San Francisco (board) to harmonize the two sections. The board asserts that if the government is required by contract to satisfy its obligation to pay pensions by making appropriations to a fund for that purpose, this constitutes a debt, not subject to the spending limitation under section 9(a). But if no such contractual requirement exists, and the government chooses as a matter of discretion to establish a pension fund as a means of accruing a reserve for the payment of pensions, then this is not an indebtedness, and the contributions to such a fund would be subject to the limitation.

The majority respond to this suggested means of harmonizing the two sections by asserting that section 5 creates an exception to section 9(a), and therefore there is no reason to attempt to harmonize the two sections. As discussed above, however, the view that section 5 is an exception to section 9(a) is untenable because it results in practically negating the effect of the latter provision.

The second answer to the board's theory offered by the majority is that the city could evade section 5 by "satisfying its contractual obligations." But this is exactly what section 9(a) requires, if such obligations are indebtedness incurred before January 1, 1979. Contrary to the majority, the board's suggestion would not nullify the express declaration in section 5 that retirement contributions are subject to limitation, for contributions to a pension fund not required to be established by contract would be included in the limitation.

Finally, in my view *Carman* v. *Alvord* (1982) 31 Cal.3d 318 [182 Cal.Rptr. 506, 644 P.2d 192] *(Carman)*, supports the conclusion that retirement contributions are an indebtedness under section 9(a). *Carman* involved the construction of article XIII A of the California Constitution (hereafter article XIII A). Subdivision (b) of section 1 of article XIII A (hereafter subdivision

(b)) exempts from the 1 percent limit on ad valorem taxes on real property imposed by section 1, subdivision (a) of the article "taxes to pay the interest and redemption charges on . . . any indebtedness approved by the voters prior to January 1, 1978 . . . ." The voters of the City of San Gabriel had, many years prior to 1978, approved a measure authorizing the city to levy a tax to fund the city's employee retirement system. After article XIII A became effective, the city levied a special tax for that purpose. The plaintiff filed an action alleging that the tax was unconstitutional because it exceeded the 1 percent limit on ad valorem real property taxes.

We held that an employer's duty to pay pensions promised and earned on terms substantially equivalent to those offered when the employee entered public service was a vested contractual right. Our opinion reasoned that the term "any indebtedness," as used in subdivision (b), includes obligations arising out of a city's pension plan, and the term "interest and redemption charges" refers to "the sums . . . necessary to avoid default on obligations to pay money, including those for pensions." (*Carman, supra,* 31 Cal.3d at p. 328; accord, *City of Fresno* v. *Superior Court* (1984) 156 Cal.App.3d 1137, 1145-1146 [202 Cal.Rptr. 313]; *City of Watsonville* v. *Merrill* (1982) 137 Cal.App.3d 185, 193 [186 Cal.Rptr. 857].)

The language of subdivision (b) is similar to that of sections 9(a) and 8(g) of article XIII B. Unless there is some persuasive reason to interpret the provisions in the two articles differently, they should be construed as having the same meaning. Nevertheless the majority assert that the term "indebtedness" has a different meaning in the two provisions because article XIII A does not have a provision similar to section 5, making contributions to retirement funds subject to the spending limitation.

But the majority fail to point to any substantive difference in a city's obligations under article XIII A and article XIII B which would justify the conclusion that the duty to pay pensions or to fund a pension system for that purpose constitutes an "indebtedness" under one but not the other. Even if the meaning of the term "indebtedness" may vary, depending on the context in which it is used, the meaning attributed to it must relate to the nature of the obligation involved. *Carman* points out that the term "indebtedness" encompasses " 'obligations which are yet to become due as [well as] those which are already matured' " (31 Cal.3d at p. 327), and in support of its conclusion it relies on a case holding that the term "indebtedness" means "a complete and absolute liability to the extent that payment must ultimately be made . . . ." (*County of Shasta* v. *County of Trinity* (1980) 106 Cal.App.3d 30, 38 [165 Cal.Rptr. 18].) There can be no question that the obligation to

pay pensions comes within these definitions. It is, therefore, an indebtedness, and is exempt from the spending limitation.

Moreover, as the Court of Appeal noted, articles XIII A and XIII B "are complementary fiscal measures designed to limit the government's ability to raise and spend tax revenues." This view is subscribed to by this court. (*City of Sacramento* v. *State of California* (1990) 50 Cal.3d 51, 59, fn. 1 [266 Cal.Rptr. 139, 785 P.2d 522].) Since, as we held in *Carman*, a government entity may impose a tax to fund pension payments without regard to the tax limitation of article XIII A, it is anomalous to hold, as do the majority, that the voters intended to prohibit the use of the funds generated for this purpose without a compensating reduction in other government expenditures.

I would affirm the judgment of the Court of Appeal.

**KENNARD, J.**—I dissent. Article XIII B of the California Constitution (hereafter article XIII B) limits state and local governments' ability to spend tax revenues. In general, a public entity can spend no more than it spent the year before, adjusted for changes in population and the cost of living. This limitation does not apply to all government spending, but only to spending falling within the constitutional definition of "appropriations subject to limitation." (Art. XIII B, § 1.) The majority holds that *all* contributions that a public entity makes to a retirement fund for its employees are "appropriations subject to limitation" and therefore subject to the article XIII B limit. This holding is based on a superficial analysis of the relevant constitutional provisions. A more complete analysis reveals that contributions to employee retirement funds are exempt from the article XIII B limit when the public entity makes them under an obligation that existed on January 1, 1979.

A provision of article XIII B exempts all "debt service" appropriations from the spending limit. (Art. XIII B, § 9, subd. (a).) In this context, "debt service" is defined as "appropriations required to pay the cost of interest and redemption charges, including the funding of any reserve or sinking fund required in connection therewith, on indebtedness existing or legally authorized as of January 1, 1979, or on bonded indebtedness thereafter approved according to law by a vote of the electors of the issuing entity voting in an election for that purpose." (*Id.*, § 8, subd. (g).)

A public entity's mandatory contributions to an employee retirement fund constitute debt service. This court so held in *Carman* v. *Alvord* (1982) 31 Cal.3d 318, 327-328 [182 Cal.Rptr. 506, 644 P.2d 192]. Although in that case we construed a provision of article XIII A of the California Constitution, rather than the "debt service" provisions of article XIII B, these two articles

are closely related and the language of the relevant provisions is virtually identical.[1] There is no sound reason to conclude that the electorate intended to give the same words different meanings in these related and complementary parts of the state Constitution. Accordingly, mandatory contributions to an employee retirement fund are exempt from the article XIII B spending limit as "debt service" if the contributions are made under an obligation existing on January 1, 1979.

The conclusion that mandatory payments to pre-1979 retirement funds are exempt as debt service is fortified by the analysis of the Legislative Analyst included in the voter pamphlet for the election at which article XIII B was enacted. In relevant part, it read: "[A] local government with an unfunded liability *in its retirement system* could appropriate its excess revenues to reduce the liability, as such an appropriation would be considered a payment toward a legal 'indebtedness' under this ballot measure." (Ballot Pamp., Proposed Amends. to Cal. Const. with arguments to voters, Special Statewide Elec. (Nov. 6, 1979) p. 20, italics added.) Stated more simply, payments to existing employee retirement funds will be exempt from the article XIII B spending limit as debt service. The majority concedes this is what the Legislative Analyst's words mean, but it asserts that the Legislative Analyst was mistaken. On the contrary, the Legislative Analyst's conclusion is the most reasonable interpretation of article XIII B's language. Moreover, the Legislative Analyst's words are persuasive evidence of the voters' intent in enacting article XIII B because the voters had those words before them, as part of the voters' pamphlet, when they were deciding how to vote, and none of the other statements in the pamphlet disputed this interpretation.

The majority relies on a provision of article XIII B that expressly refers to employee retirement contributions. It states: "Each entity of government may establish such contingency, emergency, unemployment, reserve, *retirement*, sinking fund, trust, or similar funds as it shall deem reasonable and proper. *Contributions to any such fund*, to the extent that such contributions are derived from the proceeds of taxes, *shall* for purposes of this Article *constitute appropriations subject to limitation* in the year of contribution. Neither withdrawals from any such fund, nor expenditures of . . . such withdrawals, nor transfers between or among such funds, shall for purposes of this Article constitute appropriations subject to limitation." (Art. XIII B, § 5, italics added.)

To be sure, this provision (hereafter section 5) necessarily contemplates that *some* contributions to employee retirement funds are subject to the

---

[1] Article XIII A limits real property taxes, but it exempts from this limit real property taxes imposed "to pay the interest and redemption charges on . . . any indebtedness approved by the voters" before article XIII A was enacted. (Cal. Const., art. XIII A, § 1, subd. (b).)

article XIII B spending limit. But the majority reads it more expansively. The majority concludes that under section 5 *all* contributions to employee retirement funds are subject to the article XIII B spending limit, and that the debt service provisions, to the extent they provide a basis for exempting such retirement contributions from the article XIII B spending limit, must be disregarded because they fail to mention retirement fund contributions by name. This reasoning does not withstand scrutiny.

Putting aside retirement contributions, there is a need to reconcile section 5 with article XIII B's "debt service" provisions because both refer expressly to reserve and sinking funds. Section 5 includes payments to reserve and sinking funds with retirement contributions as appropriations subject to the article XIII B spending limit, whereas the "debt service" provisions state that payments to reserve and sinking funds may qualify as debt service that is exempt from the article XIII B limit. The only way to give effect to both provisions, as required by accepted rules of statutory and constitutional construction (see, e.g., *County of Los Angeles* v. *State of California* (1987) 43 Cal.3d 46, 58 [233 Cal.Rptr. 38, 729 P.2d 202]), is to divide reserve and sinking funds into two categories, so that some of the funds are subject to limitation under section 5 while others are exempt from limitation under the "debt service" provisions. This is easily done.

Section 5 speaks prospectively ("Each entity . . . *may establish* such [reserve and sinking] . . . funds . . . .") and therefore it is reasonably interpreted to apply only to reserve or sinking funds established after article XIII B appeared on the legal horizon. The "debt service" provisions, by contrast, look generally to the past. They provide an exemption for "indebtedness existing or legally authorized as of January 1, 1979." All payments made to reserve or sinking funds in existence on that date, and which otherwise meet the constitutional definition of "debt service," are exempt.

Thus, a fair reading of article XIII B compels the conclusion that payments to reserve and sinking funds can and must be divided between those made to funds established on or before January 1, 1979 (and therefore exempt) and those made to funds established afterward (and so not exempt). If payments to reserve and sinking funds can and must be so divided, then should not contributions to retirement funds (which are a kind of reserve fund) be divided in the same manner? The majority gives no satisfactory answer to this question.

Had section 5 been intended to establish an exception to the "debt service" exemption, as the majority concludes, it would have been logical to place

section 5 with the "debt service" provisions, or at least to include within section 5 a reference to those provisions. Section 5's location distinctly apart from the "debt service" provisions, and the absence of any cross-reference to those provisions, suggests that section 5 was intended to serve a different purpose. That purpose is not difficult to discern. Rather than specifying whether particular funds are or are not exempt from the article XIII B limit, the primary purpose of section 5 is to explain *how* the article XIII B limit works when applied to those funds that are not exempt. The main point of section 5 is that in the case of various kinds of nonexempt reserve funds maintained by public entities, the article XIII B limit applies when the government makes payments into the fund, and not when payments are made out of the fund. This overriding purpose is in no way frustrated by a conclusion that certain fund payments (that is, those to service preexisting debt) are not subject to the article XIII B limit at all.

The majority relies on the rule of statutory and constitutional construction that a specific provision prevails over a general provision. But this rule applies only when the provisions at issue are inconsistent. (See Code Civ. Proc., § 1859 ["[W]hen a general and particular provision are inconsistent, the latter is paramount to the former."]; *International Assn. of Fire Fighters Union* v. *City of Pleasanton* (1976) 56 Cal.App.3d 959, 976 [129 Cal.Rptr. 68].) "Two statutes dealing with the same subject are given concurrent effect if they can be harmonized, even though one is specific and the other general." (*People* v. *Price* (1991) 1 Cal.4th 324, 385 [3 Cal.Rptr.2d 106, 821 P.2d 610].) Properly read, section 5 is not inconsistent with the "debt service" provisions of article XIII B; these provisions can and should be harmonized. Under the "debt service" provisions, a public entity's contributions to an employee retirement fund are exempt from the article XIII B limit if they are made to discharge an obligation that existed on January 1, 1979; all other contributions to employee retirement funds are subject to that limit. I would so hold.