[No. A066996. First Dist., Div. Two. Oct. 11, 1996.]

FELIX BOQUILON et al., Plaintiffs and Appellants, v.
MARY BECKWITH et al., Defendants and Appellants.

**COUNSEL**

Gilbert T. Graham and Raul S. Picardo for Plaintiffs and Appellants.

David M. McKim for Defendants and Appellants.

**OPINION**

**PHELAN, J.**[*]—In these cross-appeals, the parties seek review of a judgment of the San Mateo Superior Court by which defendant Mary Beckwith was found liable for a violation of the Home Equity Sales Contracts Act (Civ. Code, § 1695 et seq.)[1] and ordered to pay plaintiffs Felix and Natividad Boquilon damages in the amount of $10,290.60, with prejudgment interest from October 26, 1990, plus $19,852.50 in attorney and expert fees, and $2,026.05 in court costs as authorized by section 1695.7.

In the principal appeal, Beckwith contends that there was no evidence that the parties intended a "sale" to her of the Boquilons' home and that, therefore, there could be no violation of the Home Equity Sales Contracts Act. In their cross-appeal, the Boquilons argue that the trial court erred by: entering judgment in favor of Beckwith on their cause of action for fraud; finding that a codefendant, Panda Realty, was not liable for any of their damages; refusing to award exemplary damages pursuant to section 1695.7; and granting Beckwith certain credits against the judgment. The Boquilons also contend that the trial court abused its discretion by awarding only 50 percent of the amount of attorney fees they requested, on the theory that half of their attorneys' time was spent on causes of action on which they did not prevail.

We agree that the trial court improperly credited Beckwith with certain amounts paid in connection with transactions which violated the Home

---

[*]Presiding Justice of the Court of Appeal, First District, Division Three, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

[1]All statutory references are to the Civil Code unless otherwise indicated.

Equity Sales Contracts Act and that the Boquilons are, thus, entitled to additional damages in the amount of $29,273.71. However, because there is substantial evidence to support the trial court's other findings, and because we discern no abuse of discretion in the court's ruling on the fee award, we will affirm the judgment as modified to include a total award of $39,564.31 in "actual damages." (§ 1695.7.)

## I. FACTUAL AND PROCEDURAL BACKGROUND

The Boquilons purchased a home at 169 Sparrow Drive in Hercules, California, in 1979. In January 1990, Mr. Boquilon was introduced by a friend to Beckwith, who is a licensed real estate agent,[2] for the purpose of obtaining a personal loan with which to pay off his gambling debts. On January 29, 1990, Mr. Boquilon met with Beckwith in her office at Panda Realty to discuss the loan and, that day, signed a promissory note for $6,000. The note did not specify the term of the loan, and spaces for the principal sum and interest rate were left blank. Beckwith testified that she did not put an interest rate in the note because it would take too much of Mr. Boquilon's time. However, Mr. Boquilon testified that he understood he was to pay $145 per month, in interest only, on this note. Mr. Boquilon also executed a deed of trust on the Boquilons' residence, but it was never notarized or recorded.[3] The loan proceeds were drawn on an account jointly owned by Beckwith and her husband. Mr. Boquilon made monthly payments on this first loan, with interest, until May 1990.

On May 16, 1990, Mr. Boquilon obtained a second personal, unsecured loan from Beckwith in the amount of $2,000. At that time, he signed an IOU prepared by Beckwith, by which he promised to repay $2,200, plus interest only on the $8,000 principal balance until October 1990 at the rate of $190.84 per month. The trial court judicially noticed that the effective rate of interest charged by Beckwith on these personal loans was 28.6 percent.

On September 28, 1990, the Boquilons received notice that they were in default in the amount of $6,996.90 on payments on the first mortgage on

---

[2]The Boquilons correctly note that, throughout her opening brief, Beckwith studiously avoids mentioning the fact that she is a licensed real estate professional. Characterizing herself instead as "a kindly woman" and an "innocent Samaritan" who was simply trying to "help virtual strangers" as a favor to a mutual friend, she even goes so far as to argue that her "ignorance of the law," i.e., of her obligations under the Home Equity Sales Contracts Act, should be excused.

[3]Apparently, Beckwith intended to record the deed of trust if Mr. Boquilon did not repay the loan. As Mr. Boquilon was the only spouse to sign the documents conveying a security interest in what was presumably a community property home, it is unlikely that any the deed of trust would have been valid and effective in any event. (Fam. Code, §§ 1100, subd. (c); 1102, subd. (a).)

their home held by Beneficial California, Inc. (Beneficial). At the time, the balance of the loan secured by the Beneficial mortgage was $144,000. A notice of default was recorded for $7,310.65 on September 18, 1990. Beneficial offered to refinance the loan, and Mrs. Boquilon testified that she could have borrowed money from her sister to cure the default. However, Beckwith—who was aware of the notice of default, having seen a letter from Beneficial about it—advised the Boquilons not to refinance through Beneficial. Beckwith told them they had been paying too much interest and could pay substantially less by refinancing through her. Apparently to that end, in early October 1990, Beckwith had the Boquilons fill out a loan application, obtained a credit report on them from Datafax,[4] and obtained an appraisal from Taplin, Thomas & Associates, Inc. That appraisal indicated the fair market value of the house was $210,000 as of October 16, 1990.

On October 26, 1990, the Boquilons met with Beckwith at her Panda Realty office. Mr. Boquilon told Mrs. Boquilon that the purpose of the meeting was to discuss refinancing the house. "Panda Real Estate" was written on the door, Beckwith's name was on her desk, and the Boquilons believed that Beckwith was at that time acting in her capacity as a real estate agent.[5] After telling Mrs. Boquilon that Mr. Boquilon had previously borrowed $8,000, Beckwith proposed to the couple that she would make the necessary payments to cure the default with Beneficial and assist the Boquilons in refinancing their property. Beckwith further proposed that the Boquilons transfer title to her so she could refinance it in her own name at a lower interest rate than they could obtain on their own.[6] The parties agreed that, after the property had been refinanced, it would be transferred back to the Boquilons, who would then assume the new loan. Beckwith testified that she was willing to wait years to be repaid and expected that, at worst, she would have to wait seven years until the Boquilons could clear their credit after the bankruptcy. The Boquilons believed they had no choice but to accept Beckwith's proposal because she threatened to sue them on the existing promissory notes if they did not agree.

After the meeting at the Panda Realty Office, Beckwith drove the Boquilons to a title company to sign a grant deed conveying the property to her,

[4]The credit report contains an entry stating that it was "Prepared For Panda Realty, 113 El Camino Real #201, Millbrae, CA." There is no dispute that this was Beckwith's business address.

[5]Although Beckwith never discussed her status with the Boquilons, they believed she was a licensed real estate agent because the friend who introduced Beckwith told them she was. When Mr. Boquilon met with Beckwith to arrange the first personal loan, she had also given him a business card identifying herself as a realtor with Panda Realty and listing her business address and phone number.

[6]Beckwith told the Boquilons they could not get a loan in their own names because they had bad credit. The Boquilons' home had been in foreclosure twice in 1989 and they had refinanced the home several times, increasing their monthly mortgage payments from $500 to $1,700 by the time of the Beneficial foreclosure. The couple also filed for bankruptcy in 1988.

as "a married woman as her sole and separate property." The grant deed was recorded on October 29, 1990.[7] At no time did Beckwith discuss with the Boquilons the customary procedures for securing a loan by executing and recording a deed of trust, rather than a grant deed, or the difference between the two conveyances. Beckwith explained that she did not mention the possibility of executing a deed of trust instead of a grant deed because the couple had a previous foreclosure and because it "was too much bother." She also admitted that she obtained a grant deed because she was afraid Mr. Boquilon would not pay her, and she was concerned that if she used a deed of trust she herself might get foreclosed by the holder of senior security, i.e., Beneficial. Thus, it appears from her own testimony that Beckwith made a conscious decision to obtain a grant deed rather than a deed of trust to accomplish the conveyance from the Boquilons. At the time, Beckwith had never heard of the Home Equity Sales Contracts Act—despite the fact that the standard of practice for realtors in the area required her to know about such a provision.

While they were at the title company on October 26, 1990, the Boquilons also signed a form lease agreement,[8] which they understood to be for the period of time it took Beckwith to obtain a new loan on the house and transfer it back to them under an assumption of the financing. Beckwith said that the rental agreement was "only for the bank" while she was applying for refinancing. The monthly "rent" was specified in the rental agreement at $2,280, even though the fair rental value at that time was only $900 to $1,000 per month.[9] Beckwith told the Boquilons that, once the house was refinanced, they would only have to pay her $1,400 per month. In handwritten notations added to the lease agreement after it was signed, Beckwith stated that the Boquilons, as "tenant," were aware that she, the "buyer and owner," was a licensed real estate agent and that she, as the "owner," had the right to sell the property if the Boquilons defaulted.

Beckwith never mentioned the amount of money the Boquilons would have to repay to redeem their property, other than the $8,000 she had loaned to Mr. Boquilon, and did not discuss what other costs, if any, might be incurred in connection with the refinancing. Nor did Beckwith tell the Boquilons anything about the procedure for assuming the new loan she was supposedly obtaining for them. Their course of dealing with Beckwith made

---

[7]Mrs. Boquilon testified that she did not understand the difference between a grant deed and a deed of trust.

[8]The form agreement was entitled "Lease-Rental Agreement and Deposit Receipt" but, in what appears to be Mr. Boquilon's handwriting, the words "Lease-Rental" were crossed out and the words "Lease option agreement to purchase," were added to the form. As thus edited, the parties' agreement was admitted at trial as joint exhibit 13.

[9]Apparently, the rent was to be reduced to $1,800 beginning May 1, 1991.

the Boquilons concerned that she was trying to "get" the property. However, Beckwith gave the Boquilons oral assurances that she was not personally interested in "getting" the property as she lived in Hillsborough and was very wealthy.

Approximately one month after the transfer of title to Beckwith, Mrs. Boquilon called Beckwith to ask for a more precise written agreement between them as Beckwith had promised. After an angry exchange of words, Beckwith told Mrs. Boquilon, "I hate to tell you this but this is my property now." When Mrs. Boquilon said she would be calling an attorney for advice, Beckwith said, "[O]h you brat," and hung up the telephone.

On November 20, 1990—approximately one month after the Boquilons executed the grant deed—Beckwith transferred the property to her husband and herself as joint tenants and closed escrow on a new loan of $153,750 from American Savings. Beckwith paid the following costs in connection with the refinancing with American Savings: $3,768.62 in loan fees, $703.20 for title insurance premiums, $281.25 in escrow fees, $32 for recording, $452.48 for fire insurance, $142,578.88 to pay off the principal balance of the Beneficial loan, additional interest in the amount of $1,053.55, other fees of $105, and a prepayment penalty of $7,969.18 on the Beneficial loan.[10] All of these costs were covered by the proceeds of the American Savings loan, except for $3,713.37 which Beckwith paid into escrow out of her own funds. Beckwith never told American Savings that she was not the true owner of the property when she applied for the new loan. After the property was refinanced, Beckwith reduced the Boquilons' monthly payments to her to $1,800.

In order to get some cash out of the property to repay herself for the loans she had made to Mr. Boquilon, Beckwith refinanced the property again. She paid an amount exceeding $1,000 in costs in connection with this second refinancing. The total additional costs incurred by Beckwith and added to the loan balance as a result of the two separate refinancings were $15,014.88. Beckwith admitted she never gave the Boquilons any estimate of closing costs, which is normally done by financial institutions that make loans to consumers.

On December 17, 1990, Beckwith met with the Boquilons in her office for the stated purpose of "giving them their property back." Instead, at Beckwith's insistence, the parties signed a handwritten note prepared by Beckwith stating that Beckwith, as the "owner of [the] property," would sell the

---

[10]Beckwith admitted that she never noticed that a prepayment penalty applied to the Beneficial loan if it was paid off early, or that approximately $7,000 could have been saved by waiting two years.

property and the balance would be paid to the Boquilons, as the "tenant," after Beckwith had paid "all expenses from all escrows from title company," including the loan from Beneficial. The Boquilons testified that they never agreed to Beckwith's plan to sell their house and signed the note under duress because it was the only way they would be able to get any money out of their property now that Beckwith owned it and they had no written documents to prove their interest in the property. There was no discussion of a sale price or any other terms of sale.

In May 1991, Beckwith told the Boquilons that their property had been sold and that they would have to pay a reduced amount of rent to the new owner. The Boquilons asked for their equity, but Beckwith said there was no equity. The Boquilons then went to a lawyer for advice.[11] When Beckwith found this out, she begged the Boquilons not to involve a lawyer and assured them that, if they would stop seeing the attorney, she would handle the transaction fairly and put off the sale.

On July 22, 1991, the Boquilons received a letter from Beckwith stating that the property had been sold to Rolando and Fe Flores. On August 15, 1991, the Boquilons were served by Beckwith with a three-day notice to pay rent or quit. On September 13, 1991, Mrs. Boquilon wrote to Beckwith, pleading: "I want my property . . . back[,] let me assume your loan like you promise to us." The Boquilons and their three children were eventually evicted from their home of 15 years and, on October 21, 1991, judgment for possession and damages in the amount of $4,120 was entered in favor of Beckwith.

On March 6, 1992, Beckwith closed a sale of the property to Reynaldo C. and Ester V. Frias for $194,000. Beckwith claimed a commission of $2,910 on the sale even though she was the seller and had given an exclusive listing to another realtor.

The Boquilons filed their complaint on July 8, 1992, naming Beckwith and Panda Realty as defendants and alleging causes of action for fraud, breach of contract, and violation of the Home Equity Sales Contracts Act. Beckwith cross-complained, and the case proceeded to a bench trial on March 7, 1994.

The court issued a tentative decision on March 31, 1994, finding that Beckwith violated the Home Equity Sales Contracts Act; that the date of

---

[11]On July 30, 1991, Mrs. Boquilon filed a fraud complaint with the Contra Costa County District Attorney. On August 14, 1991, the district attorney sent the parties a letter saying he was closing his file based on representations from Beckwith that she would provide the Boquilons with a complete accounting and pay them the net proceeds of the sale after deducting what she was owed.

transfer was October 26, 1990; that the property was worth $210,000 at the time of the transfer; and that plaintiffs were entitled to prejudgment interest and attorney fees. However, the court found against plaintiffs on the fraud causes of action, on the exemplary damages claim under the act, and on the claim that Beckwith's actions were "unconscionable" within the meaning of section 1695.13. Specifically, the trial court stated: "[T]he Court finds no violation of Paragraph 3 of Subdivision B of Section 1695.6. Clearly, the encumbrance by American Savings was done with the knowledge, consent and agreement of the Boquilon's. [¶] The Court further finds that Defendant's motive was not to take unconscionable advantage of the Plaintiffs in this situation. The Court finds that she acted out of a motivation to help a friend and that the primary factor in this whole transaction was the Plaintiffs' failure to make payments to Ms. Beckwith consistent with their agreements. [¶] Both Mr. and Mrs. Boquilon testified that they understood that Ms. Beckwith was to be paid-off and they had to assume the loan to get title back. Ms. Beckwith's testimony was that she was prepared to give them up to seven years to make those payments—a period of time [in] which their credit would be cleared from the bankruptcy and foreclosure. None of that can be construed as bad faith or unconscionability on Ms. Beckwith's part." In computing damages, the court granted credits against the appraised value for: payoff of the Beneficial mortgage ($152,926); closing costs related to the eventual sale of the property by Beckwith ($10,585.15); the principal balance of the loans Beckwith made to Mr. Boquilon ($8,000); and past-due rent under the rental agreement ($6,070.00). After deducting these amounts, and giving the Boquilons credit for $9,250 in payments to Beckwith, the Boquilons were left with a tentative net damages award of $15,230, plus prejudgment interest from October 26, 1990.

After the parties filed objections to the tentative decision, the trial court amended its decision to allow additional credits in favor of Beckwith, as follows: $6,671 for a payment she made to Beneficial on October 30, 1990, to cure the Boquilons' default; $1,706.21 Beckwith paid Beneficial on November 15, 1990; an additional month's rent at the monthly rental rate of $2,280; and refinancing "escrow costs" of $1,895.19, $3,713.37, and $452.48 (a total of $6,061.04) associated with the refinancing. Plaintiffs, too, received an additional credit for rent paid in the amount of $3,750. Final judgment for plaintiffs was entered on June 22, 1994, in the sum of $10,290.60, plus interest from October 26, 1990. Plaintiffs were subsequently awarded $19,852.50 in attorney fees, but this was only half the amount they had sought. The trial court reasoned that the attorney fees were allocated 50-50 between the fraud cause of action, on which plaintiffs did not prevail, and the statutory cause of action, on which they did prevail. These timely cross-appeals followed.

## II. DISCUSSION

The Home Equity Sales Contracts Act (hereinafter, sometimes, the Act) was enacted to protect homeowners who are faced with foreclosure proceedings and may find themselves at the mercy of unscrupulous individuals who "induce homeowners to sell their homes for a small fraction of their fair market values through the use of schemes which often involve oral and written misrepresentations, deceit, intimidation, and other unreasonable commercial practices." (§ 1695, subd. (a).)[12] Of course, the Legislature did not prohibit the sale of distressed properties to such individuals, but did establish a number of procedural protections and mandatory preconditions to such sales. Thus, the Legislature declared that the "intent and purposes" of the Act are: "To provide each homeowner with information necessary to make an informed and intelligent decision regarding the sale of his or her home to an equity purchaser; to require that the sales agreement be expressed in writing; to safeguard the public against deceit and financial hardship; to insure, foster, and encourage fair dealing in the sale and purchase of homes in foreclosure; to prohibit representations that tend to mislead; to prohibit or restrict unfair contract terms; to afford homeowners a reasonable and meaningful opportunity to rescind sales to equity purchasers; and to preserve and protect home equities for homeowners of this state." (§ 1695, subd. (d)(1).) The Legislature further declared that the Act "shall be liberally construed to effectuate this intent and to achieve these purposes." (*Id.*, subd. (d)(2).)

In *Segura* v. *McBride* (1992) 5 Cal.App.4th 1028 [7 Cal.Rptr.2d 436] (*Segura*), Division Four of this court explained the basic structure of the Home Equity Sales Contracts Act: "[T]he Act seeks to regulate transactions between an equity purchaser and an equity seller resulting in the sale of residential real property in foreclosure.[13] At the heart of the scheme is the requirement that the agreement between buyer and seller be in writing, with specific terms aimed at protecting the homeowner. (§§ 1695.2, 1695.3,

[12]As a threshold matter, Beckwith contends that the Boquilons "released" all claims against her when they signed a handwritten statement on September 9, 1991, which states: "1. We want to have the opportunity to purchase our property back in the near future. 2. We willing [*sic*] to pay the back payment on rent that we owe to Mary Beckwith. 3. We will sign a rental agreement for month to month. 4. We hereby hold Mary Beckwith harmless . . . ." The trial court rejected this affirmative defense, and so do we. On its face, the documents does not evince an intent on the part of the Boquilons' to relinquish their Home Equity Sales Contracts Act claim or, for that matter, any other rights or claims they had against Beckwith. Moreover, to the extent the Boquilons' execution of this sketchy document can be stretched to include a waiver of their rights under the Act, it is "void and unenforceable as contrary to public policy." (§ 1695.10.)

[13]For purposes of the Act, " 'Residence in foreclosure' and 'residential real property in foreclosure' means residential real property consisting of one- to four-family dwelling units,

1695.5.) The contract must include the total consideration given, terms of payment and terms of any rental agreement; a conspicuous statement of the right to cancel within five business days or until 8 a.m. on the day scheduled for foreclosure, with an attached notice of cancellation; and a conspicuous notice that until the right to cancel has ended, the equity purchaser cannot ask the seller to sign a deed or any other documents. (§§ 1695.3-1695.5.) The equity purchaser must provide, and complete, the contract in conformity with these terms. (§ 1695.6, subd. (a).) [¶] During the 'cooling off' period, the equity purchaser cannot take title to the property by written instrument or recordation thereof; transfer or encumber any interest in the property; or pay the seller any consideration. (§ 1695.6, subd. (b).) Moreover, the purchaser cannot make untrue or misleading statements about the value of the property, any foreclosure proceeds, or the terms of sale. (§ 1695.5, subd. (d).) Additionally, when the seller grants the residence by an instrument purporting to be an absolute conveyance but reserves or is given an option to repurchase, the equity purchaser cannot grant any interest in the property to another without the written consent of the seller. (§ 1695.6, subd. (e).) Finally, it is unlawful to take unconscionable advantage of the property owner in foreclosure. (§ 1695.13.) Depending on the nature of the violation, the aggrieved seller may be entitled to rescission, other equitable relief or damages, including exemplary damages. (§§ 1695.7, 1695.14.)" (*Segura, supra,* 5 Cal.App.4th at pp. 1035-1036, fns. omitted.)

## A. Substantial Evidence Supports the Trial Court's Finding That Beckwith Violated the Home Equity Sales Contracts Act.

█ Beckwith contends that there was no "sale" of the plaintiffs' home for purposes of the Home Equity Sales Contracts Act and that, therefore, she cannot be held liable for a violation of the statute. More specifically, Beckwith contends that the Boquilons were not "equity sellers" within the meaning of section 1695.1, subdivision (c), because they never intended to sell their house, but only to transfer "bare legal title" to her "solely for purposes of refinancing." These arguments are utterly without merit.

### 1. Beckwith Violated Section 1695.6, Subdivisions (a) and (e).

With or without a "sale"—at least as Beckwith defines that term—there is in this case ample evidence to support at least two separate violations of the Act. This case is on all fours with *Segura, supra,* 5 Cal.App.4th 1028. In that case, plaintiff Segura purchased a home in Ferndale from a couple, the Dilleshaws, who took back a note and deed of trust for the balance of the

one of which the owner occupies as his or her principal place of residence, and against which there is an outstanding notice of default . . . ." (§ 1695.1, subd. (b).)

sale price over the down payment. Segura also had a loan on his truck from the Bank of Loleta (Bank), and that Bank eventually assumed collection of the payments on the Dilleshaw note. In early 1982, Segura fell behind on his house and truck payments, so he took out an additional loan from the Bank, which secured the new loan with a second deed of trust. Subsequently, Segura defaulted on that obligation, and the Bank commenced foreclosure proceedings in July 1982. (*Id.* at pp. 1031-1032.) At that point, Segura approached defendant Dorothy McBride, whom he considered to be "like 'family,' " to discuss his financial predicament. Thereafter, Segura met with the manager of the Bank to say that he would try to cure the default and that McBride might be willing to assist. In November 1992, after the Bank manager had discussed the matter with McBride, the plaintiff and defendant McBride attended a meeting at the Bank at which Segura signed a grant deed conveying all of his property to McBride. In return, McBride made payments to retire the Bank loan on Segura's property, assumed the Dilleshaw obligation, and brought his taxes up to date. Thereafter, McBride made monthly payments of $180 on the Dilleshaw note, paid the taxes and insurance premiums, and charged Segura $200 a month to live in the house. Both parties expected that McBride would transfer title back to Segura in a short period of time, but disagreed about the conditions under which such a transfer would occur. Within a few months, Segura fell behind in his rent payments and McBride's bookkeeper warned him that if he did not make regular payments, McBride would have to resell the property. In November 1984, McBride conveyed an undivided one-third interest in the property to her son (Jon McBride), her granddaughter, and herself, and transferred her remaining interest to the granddaughter in June 1985. (*Id.* at p. 1032.) Jon assumed responsibility for all payments on the house, and began charging Segura $350 per month to live there. After receiving only one such payment, Jon began unlawful detainer proceedings and Segura eventually left the premises voluntarily. In May 1985, Segura tendered $15,000 to " 'buy [his] property back,' " but the tender was refused. (*Id.* at pp. 1032-1033.) Jon and his daughter completed a sale of the property in 1988. (*Id.* at p. 1033.)

On appeal, McBride contended that she was not an "equity purchaser" within the meaning of the Act because ". . . when the Legislature enacted the above described protective scheme, it was concerned with individuals engaged in the business of purchasing equities, who solicited equity refinancing as a business practice." (*Segura, supra,* 5 Cal.App.4th at p. 1036.) Her transaction with the plaintiff, by contrast, was an "isolated buy[]" and she was "neither soliciting nor in the business of equity purchasing." In response to that argument, the court held: "[E]xcept for certain persons specifically exempted from regulation, the Act applies to *all* persons who purchase a residence subject to an outstanding notice of default, regardless

of whether the purchaser routinely engages in such transactions, and regardless of whether the distressed buyer initiates the negotiations." (*Id.* at p. 1031.) Then, looking at the particular facts of the case before it, the *Segura* court explained how McBride's conduct violated the Act: "McBride was an equity purchaser not because she was an unscrupulous person engaged in the business of buying home equities at a discount, but because she acquired title to Segura's residence while that residence was in foreclosure. Segura did not receive one penny for his equity, and eventually McBride's son was able to turn a handsome profit on the property. There was an understanding that Segura retained a right to reacquire title to the property, whether under conditions (McBride's story) or not (Segura's story), yet McBride conveyed the property summarily without notifying Segura. Her son then upped the 'rent,' refused Segura's tender and eventually precipitated his vacating the premises. Segura lost his home and his equity based on agreements and understandings that were never reduced to writing. *This the very situation which the Act intends to prevent.* [¶] Segura was entitled to damages because McBride did not satisfy the statutory mandates. She did not offer him a written contract, with appropriate terms, notices and disclosures. (§ 1695.6, subd. (a).) Although she claimed he had a right to repurchase the property if he performed by paying rent and coming up with funds to cash her out, this repurchase right was never reduced to writing and she granted an interest in the property to her son and granddaughter without Segura's consent. (§ 1695.6, subd. (e).)" (*Segura, supra,* 5 Cal.App.4th at pp. 1037-1038, italics added.) Because of these violations by McBride, Segura was entitled to recover his "actual damages." (*Ibid.*)

Beckwith violated the Act in precisely the same ways. First, she "acquired title to [the plaintiffs'] residence while that residence was in foreclosure," without a written contract, without a clearly delineated "cooling off" period, and without the appropriate notices and disclosures, all in violation of section 1695.6, subdivision (a). (Cf. *Segura, supra,* 5 Cal.App.4th at pp. 1037-1038.) Then, by a conveyance that appears on its face to be "absolute," but as to which there was an "understanding" that the plaintiffs "retained a right to reacquire title," Beckwith granted an interest to her husband and placed an encumbrance on the property (in favor of American Savings) without the Boquilons' specific written consent, in violation of section 1695.6, subdivision (e). (Cf. *Segura, supra,* 5 Cal.App.4th at pp. 1037-1039.) These violations of the Home Equity Sales Contracts Act are clearly sufficient to sustain the trial court's judgment on the Boquilons' statutory cause of action.[14]

---

[14]Of course, the trial court was in a sense correct when it noted that there was no outright "sale" in either *Segura* or in the instant case—at least insofar as the parties actually intended

### 2. *Substantial Evidence Supports the Trial Court's Finding That Beckwith Did Not Violate Section 1695.6, Subdivision (b)(3).*

■ It is, however, less clear there is substantial evidence to support the trial court's findings that the conveyance from Beckwith to her husband, the refinancing with American Savings and the subsequent sale to the Friases, did not violate section 1695.6, subdivision (b)(3), and that the Boquilons were not, therefore, entitled to a mandatory award of exemplary damages under section 1695.7.

In its statement of decision, the trial court reasoned that "the encumbrance by American Savings was done with the knowledge, consent and agreement of the Boquilons." The Boquilons do not dispute that there is evidence they knowingly agreed and consented to Beckwith's plan to refinance with American Savings, but argue that exemplary damages must nevertheless be awarded because Beckwith transferred an interest in the property to her husband and encumbered the property before "the time within which the equity seller may cancel the transaction [had] fully elapsed." (§ 1695.6, subd. (b)(3).)

We disagree with the Boquilons' analysis, which would greatly expand the coverage of the mandatory exemplary damages provision beyond what was intended by the Legislature. Section 1695.6, subdivision (b)(3) applies to the situation where an equity purchaser has given the notices required by the Act but, nevertheless, proceeds to transfer or encumber the property within the statutory cancellation period. (See *Segura, supra,* 5 Cal.App.4th at p. 1035 ["During the 'cooling off' period, the equity purchaser cannot take title to the property by written instrument or recordation thereof; transfer or encumber any interest in the property; or pay the seller any consideration. (§ 1695.6, subd. (b).)"].) That is, of course, not what happened here.[15] As we have discussed, the factual scenario presented in this case falls squarely

and agreed upon a sale and lease-back, with an option to regain title to the house on unspecified terms. The Act nonetheless applies and was violated. Indeed, it very specifically prohibits any encumbrance or further transfer of any interest in a residence in which the "equity purchaser purports to hold title as a result of any transaction in which the equity seller grants the residence in foreclosure by any instrument which purports to be an absolute conveyance[,] and reserves or is given by the equity purchaser an option to repurchase such residence . . . ." (§ 1695.6, subd. (e).) Subject to the rights of a bona fide purchaser, such a transaction is presumed to be a loan transaction and the purported absolute conveyance a mortgage. (§ 1695.12.)

[15]Our dissenting colleague asserts that we are proceeding on a theory that "a cancellation period that never began cannot expire." (See conc. and dis. opn., *post,* at p. 1725.) He is mistaken. Without a written contract for sale (a clear violation if section 1695.6, subdivision (a), and without a scheduled date for a "sale of the property pursuant to a power of sale conferred in a deed of trust" (§ 1695.4, subd. (a)), there is simply no way to demarcate the

within the ambit of section 1695.6, subdivision (e).[16] That subdivision imposes *liability* on an equity purchaser who "purports to hold title as a result of any transaction in which the equity seller grants the residence in foreclosure by any instrument which purports to be an absolute conveyance[,] and reserves or is given by the equity purchaser an option to repurchase such residence" (*ibid.*) and who thereafter transfers the property to a third party or places an encumbrance on the property (§ 1695.7), but it does not form the basis of a mandatory award of statutory treble damages (*ibid.*), unless the element of "unconscionable advantage" is present (§ 1695.13).

While it is not absolutely clear why the Legislature would differentiate between these two types of equity purchasers for purposes of an exemplary damages award, it is not irrational to treat one who goes through the motions of honoring their statutory commitments, then flouts the law, as more culpable than one who, like Beckwith (despite her status as a real estate professional), is ignorant of the law's requirements.[17] It is also reasonable to believe that the Legislature considered the factual circumstances of this case would be quite common, i.e., that the equity purchaser and seller would start out as friends, intent upon the seller recovering title at some early date, but that the relationship would deteriorate to the point that the equity purchaser would feel compelled to resell or refinance the property to cut her losses. In such a case, and contrary to the suggestion of our dissenting colleague, the Legislature rationally could have concluded that the protections afforded by the notice and cancellation provisions were less important—and the violation of those provisions less serious—because the parties to an "option to

statutory cancellation period for purposes of a section 1695.6, subdivision (b), violation. It is, rather, *the Boquilons' theory* that the "time within which the equity seller . . . may cancel the transaction" (*ibid.*) began running at some unspecified time, has continued running even to this day, and can *never* expire. Under this theory, even if Beckwith had waited years before transferring an interest in the property, well beyond any conceivable "cooling off period," the dissent would find a violation of subdivision (b)(3), and require an award of punitive damages pursuant to section 1695.7.

[16]Our holding on this point is consonant with the well-worn maxim that a more specific provision relating to a particular subject will govern in respect to that subject, as against a general provision, although the latter standing alone would be broad enough to include the subject to which the more particular provision relates. (*Rose v. State of California* (1942) 19 Cal.2d 713, 723-724 [123 P.2d 505]; see also *San Francisco Taxpayers Assn.* v. *Board of Supervisors* (1992) 2 Cal.4th 571, 577 [7 Cal.Rptr.2d 245, 828 P.2d 147].)

[17]The dissent relies heavily on an assumption that Beckwith was a "knowledgeable" equity purchaser, who was aware of and "deliberately fail[ed]" to perform her duties to provide the Boquilons with notice and a written contract of sale, as required by the Home Equity Sales Contracts Act. (See conc. and dis. opn., *post*, at pp. 1725, 1726.) There is no support in the record for such an assumption. It is undisputed that Beckwith had never heard of the Home Equity Sales Contracts Act when the Boquilons conveyed their property to her. If the facts were otherwise, we trust the trial court would have given them due weight in deciding whether Beckwith's conduct was "unconscionable" (§ 1695.13), or "malicious" or "oppressive" (see § 3294), so as to justify an award of exemplary damages under section 1695.7.

repurchase" would have an ongoing relationship, and the equity sellers would have the right to "cancel" the deal and recover their equity interest, for a much longer period than provided in section 1695.4.[18]

By contrast, the Boquilons'—and the dissent's—reading of section 1695.6, subdivision (b)(3), would *require* an award of treble damages in every case in which an innocent and ignorant equity purchaser failed to provide a written contract or to fulfill completely the other technical requirements of the Act, then proceeded to deal with the property as the new owner by encumbering or transferring any interest in it. Surely, such an expansive exemplary damages provision was not intended by the Legislature. (See § 1695.7.) We conclude that the Legislature intended to mandate exemplary damages only in the exceptional, not the ordinary case, and only in those cases where the violation of the Act was knowing and intentional.[19]

The Boquilons further contend that Beckwith is liable for treble damages under section 1695.7 because she resold the property to the Friases in violation of section 1695.6, subdivision (b)(3). We disagree. Again, section 1695.6, subdivision (e), applies to this transaction, and it is unclear whether even that section was violated because there is evidence in the record that Beckwith obtained a written "consent" from the Boquilons to solicit and complete such a sale, and then notified the Boquilons in writing of the proposed sale to the Friases. (See § 1695.6, subd. (e).) However, there is also evidence that the "consent" was invalid because it was obtained in circumstances amounting to economic duress—a situation that would not have existed but for Beckwith's violations of the Act. (See §§ 1695, 1689, subd. (b)(1).) By the time they "consented," moreover, the other more technical violations of the Act had taken their toll on the Boquilons' equity interest. Beckwith had obtained title to the property, subject only to the American Savings first mortgage, and was free to dispose of it. The Boquilons had no

---

[18]In this case, for example, the parties agreed that the Boquilons would have the right to recover the property after it was refinanced, and Beckwith testified that she was willing to wait as long as seven years for them to qualify to assume the loan, so long as they kept up with required payments. Had they done so, and ultimately recovered title, the Boquilons would have been no worse off at the end of their dealings with Beckwith than if they had, pursuant to notice, cancelled the sale and refinanced on their own.

[19]The dissent contends that, under our interpretation of the Home Equity Sales Contracts Act, "whenever an equity purchaser violates subdivision (a) he or she cannot violate any of the prohibitions of subdivision (b)." (Conc. and dis. opn., *post*, at pp. 1725-1726.) That may be a logical end point of our holding, but that is a problem to be addressed to the Legislature. We are not terribly troubled by this outcome, however, because the equity seller who establishes a violation of section 1695.6, subdivision (a), will still be able to recover any equity lost (as here) as a result of that violation. (§ 1695.7.) The equity seller may also, upon a showing of unconscionability, fraud, malice, oppression or other "proper" grounds (§§ 1695.7, 1695.13, 3294) recover exemplary damages pursuant to section 1695.7. It is only a *mandatory* award of exemplary damages that is foreclosed by our analysis.

documentation with which to dispute her ownership interest, or to establish their "option" to repurchase the property. Short of filing this lawsuit, there was nothing they could do to prevent Beckwith from dealing with the property, as she did as the legal "owner," without regard to their equity interest.[20] Nevertheless, given the conflicting evidence on this point, we find no error in the refusal of the trial court to award treble damages based on the resale of the property to the Friases.

### 3. The Boquilons Are Entitled to Recover Their Actual Damages for the Established Violations of the Home Equity Sales Contracts Act.

■ Beckwith concedes that she violated section 1695.6, subdivision (a), in that there was no "writing" as required by that provision. She contends, however, that the Boquilons were not harmed by this "technical violation" of the Act. Beckwith is wrong. The statute requires more than a mere "writing." It requires written explication of the financial terms of the parties' agreement including the total consideration given, terms of payment, and "any services of any nature which the equity purchaser represents he will perform for the equity seller before or after the sale." (§ 1695.3, subds. (c), (d).) It also requires "a conspicuous statement of the right to cancel within five business days or until 8 a.m. on the day scheduled for foreclosure, with an attached notice of cancellation; and a conspicuous notice that until the right to cancel has ended, the equity purchaser cannot ask the seller to sign a deed or any other documents." (*Segura, supra,* 5 Cal.App.4th at p. 1035, citing §§ 1695.3-1695.5) Had the Boquilons had the benefit of these written notices, they may well have been alerted to the need for and obtained consultation with an attorney earlier in their dealings with Beckwith, rejected Beckwith's plan to refinance in favor of a private loan from Mrs. Boquilon's sister to cure the default, or pursued a more favorable arrangement with Beneficial that might have increased their monthly outlay but allowed them to retain title to the home in which they had approximately $66,000 worth of

---

[20]For similar reasons, we reject Beckwith's argument that the Boquilons are "estopped" to claim damages because they agreed to her plan to put the property up for sale even as the relevant real estate market was entering a period of decline. This circumstance only added to the economic pressure the Boquilons experienced when they realized Beckwith had full control of their property and that they had no way to realize their equity interest. Moreover, Beckwith's "estoppel" theory would completely vitiate the important protections provided by the Home Equity Sales Contracts Act. Under this theory, notwithstanding the clear dictates of the Act, an equity purchaser who acquired title to a "residence in foreclosure" under an express or implied—but unwritten—agreement to resell the property would never have to answer in damages to the equity seller who lost all or part of her equity in the deal. As a matter of law, no estoppel arises in such a situation. (See §§ 1695.6, subds. (a), (b), 1695.7.)

equity.[21] Instead, by simply granting their property to Beckwith outright without the benefit of the disclosures and "cooling off" period prescribed by the statute (thereby enabling Beckwith to encumber and resell the property to a third party), the Boquilons—just like Segura—ultimately "lost [their] home and [their] equity based on agreements and understandings that were never reduced to writing. *This is the very situation which the Act intends to prevent.*" (5 Cal.App.4th at p. 1038, italics added.) Accordingly, Beckwith may be held to answer in damages for the established violations of the Home Equity Sales Contracts Act. (§ 1695.7.)[22]

B. *The Computation of Damages Must be Modified to Reflect the Boquilons' Loss of Equity as of the Date of the Violation of the Home Equity Sales Contracts Act, With Offsets Only for Those Expenses That Would Have Been Incurred Independent of the Violations of the Home Equity Sales Contracts Act.*

The *Segura* court also provided some guidance on the calculation of damages for a violation of the Home Equity Sales Contracts Act, holding that "damages based on the homeowner's lost equity should be assessed as of the date of the violation." (5 Cal.App.4th at p. 1038.) In that case, the court found that Segura "lost his equity" in 1982, when he transferred his property to McBride. (*Id.* at p. 1038, fn. 11.) Here, the trial court found that the first violation of the statute occurred when the Boquilons executed a grant deed in favor of Beckwith on October 26, 1990.

Beckwith raises only one claim of error with respect to the award of damages, i.e., that she is entitled to an additional credit for a commission on the resale of the subject property to the Friases. We disagree. As the new "owner" of the property, Beckwith gave an exclusive listing to another real estate brokerage, Red Carpet Elite Realty, with the understanding that the standard 6 percent commission would be split 50-50 between the listing and selling agent. The trial court found that a commission of $11,640 was paid, but declined to credit Beckwith with $2,910 she personally received from the proceeds of the sale. In essence, then, the trial court ordered Beckwith to

[21]At a minimum, the Boquilons might have avoided the substantial prepayment penalty assessed by Beneficial when Beckwith refinanced with American Savings.

[22]Beckwith also contends that her ignorance of the law, i.e., of her obligations under the Home Equity Sales Contracts Act, should be "excused." We marvel at the audacity of such an argument coming from a party who is a licensed real estate professional, but also note that even well-meaning lay people (indeed, close personal friends of the equity seller) who acquire title to a "residence in foreclosure" must abide by the technical requirements of the Act for conveyance of such property, or face liability for damages to equity sellers who lose their equity in the process. (*Segura, supra,* 5 Cal.App.4th 1028; cf. § 1695.1, subd. (a)(6) [a "spouse, blood relative, or blood relative of a spouse" cannot be an "equity purchaser" subject to the Act].)

return this sum to the Boquilons. We will not disturb this portion of the trial court's judgment. Beckwith obtained the apparent right to resell the Boquilons' property through a violation of the Act. The trial court did not err in concluding that she should not be allowed to profit from that transaction.

For their part, the Boquilons argue that the trial court improperly gave Beckwith certain credits against the full amount of equity they had in their home as of October 26, 1990. Specifically, they contend that Beckwith received undue credits for certain costs incurred after the date of transfer, including: (1) the amount of "rent" over and above the fair rental value, or above the agreed amounts for the period from October 26, 1990, through April 30, 1991 (at the rate of $2,280 per month) and from May 1, 1991, through the eviction in October 1991 (at the rate of $1,800 per month); (2) $10,347.52 (including the $7,969.18 in prepayment penalties), which was the amount of the Beneficial payoff of $152,926.40 in excess of the principal balance of the loan ($142,578.88) as of November 26, 1990, and $6,061.04 in additional "escrow costs" awarded after the parties filed objections to the trial court's tentative statement of decision; (3) $2,273.34 in interest paid on the Beneficial loan for the period November 16 to December 27, 1990, which amount was credited to Beckwith in the closing of escrow on the refinancing from American Savings, and which she also claimed as a component of the $2,280 "rent" payments that were due during that period; and (4) $10,585.15 in closing costs incurred in connection with the sale to the Friases in March 1992 (after deducting Beckwith's share of the commission paid from the sale proceeds). We will address each of these claims of error in turn.

While the Boquilons may have been overcharged for "rent," we cannot agree that they were entitled to live rent-free for over a year in the house to which Beckwith had obtained title, even though she did so through various violations of the Act. Moreover, with one limited exception, we find that the Boquilons have failed to carry their burden of demonstrating error in the trial court's calculation of the "rent" credit. The trial court computed the Boquilons' "rent" obligation based on a written agreement to pay $2,280 per month for the six-month period from October 26, 1990, through April 30, 1991, plus $1,800 per month for the six-month period from May 1, 1991, through October 1991. But that agreement was undisputedly designed to cover *both* the housing costs and payments on Mr. Boquilon's gambling loans. Beckwith's violations of the Act did not, after all, absolve the Boquilons of their obligation to repay, with interest, the $8,000 in personal loans she extended to cover Mr. Boquilon's gambling debts. And while the interest rates Beckwith charged were excessive, the Boquilons did not establish any other cause of action that would allow them to avoid repayment of those loans on the stated terms. The combined rent/gambling

obligation thus totaled $24,480 for the period from October 26, 1990, through the end of October 1991. The trial court reduced that amount by $13,000 for payments the Boquilons made during that period, and the Boquilons have not demonstrated that they actually paid more than that.[23] But the court also gave Beckwith an additional credit for a seventh month of rent at the rate of $2,280. We, therefore, conclude that the Boquilons are entitled to an additional $2,280 in damages to correct this error in the computation of the "rent" offset.

We also agree that Beckwith should not have been credited with the $7,969.18 in prepayment penalties paid to Beneficial, or the other costs incurred in connection with the American Savings refinancing. This sum of $10,347.52 should not have been charged to the Boquilons because they did not consent in writing to that transaction, as required by section 1695.6, subdivision (e). The $6,061.04 in additional "escrow costs" credited to Beckwith after the parties filed their objections to the tentative decision was, likewise, improperly deducted from the Boquilons' equity. Similarly, the $10,585.15 in closing costs incurred upon resale of the property should not have been deducted from the Boquilons' recovery. The Boquilons should, thus, receive an additional $26,993.71 in damages to correct these errors.[24] Combined with the correction of the "rent" calculation, the Boquilons' damages award must be increased by $29,273.71, for a total award of $39,564.31, plus prejudgment interest from October 26, 1990, to date.

### C. Substantial Evidence Supports the Trial Court's Finding That Beckwith Was Not an Agent of Panda Realty.

The Boquilons contend that Beckwith was the ostensible agent of Panda Realty when she violated the Home Equity Sales Contracts Act. The parties agree that the issue whether Beckwith was acting as an agent of Panda Realty in her dealings with the Boquilons is a question of fact. (*Preis* v. *American Indemnity Co.* (1990) 220 Cal.App.3d 752, 761-762 [269 Cal.Rptr. 617] [whether an insurer's agent had authority, either actual or ostensible, to act as he did was question of fact], citing *Thompson* v.

---

[23] The Boquilons have not adequately demonstrated that the $2,800 they claim to have paid toward the $4,120 unlawful detainer judgment was paid in addition to the $13,000 with which they were credited. We will not presume the trial court erred in denying them an additional credit for this "rent" payment.

[24] The Boquilons' argument about the $2,273.34 interest payment to Beneficial is confusing, but we understand it to be subsumed in their argument that they should not be charged for any portion of the costs incurred in connection with the refinancing except the amount(s) required to cure their default and pay off the principal balance of the Beneficial loan. We further understand the $2,273.34 to be part of the $26,993.16 we are restoring to the Boquilons' damages award.

*Occidental Life Ins. Co.* (1969) 276 Cal.App.2d 559, 564 [81 Cal.Rptr. 37].) We will not disturb the trial court's negative finding on this issue if there is substantial evidence, whether contradicted or uncontradicted, to support it. (See *Bowers* v. *Bernards* (1984) 150 Cal.App.3d 870, 873-874 [197 Cal.Rptr. 925].) We conclude that substantial evidence supports the trial court's ruling.

As Beckwith notes, there is no real dispute that the loans made to Mr. Boquilon to pay off his gambling debts were made by Beckwith acting in her individual capacity. The funds came from Beckwith's personal checking account, and the loans were evidenced by a note and (an unrecorded) deed of trust executed in favor of Beckwith personally. More importantly, however, it is undisputed that the Boquilons conveyed their residence to Beckwith personally, not to Panda Realty (or to Beckwith in some representative capacity), and that there was no subsequent transfer to Panda Realty as an entity. Indeed, there is no evidence cited to this court to indicate Panda Realty is a separate legal entity, capable of acquiring or holding title to real property.[25] It is this conveyance to Beckwith, without compliance with the Act, that underlies the Boquilons' successful cause of action for damages. In these circumstances, the trial court did not err in concluding that Beckwith was not an agent of Panda Realty in connection with her dealings with the Boquilons.

### D. *Substantial Evidence Supports the Trial Court's Finding That Beckwith's Conduct Was Neither Fraudulent Nor "Unconscionable" Within the Meaning of Sections 1695.7 and 1695.13.*

■ The Boquilons next contend that there was no substantial evidence to support the trial court's finding that Beckwith did not defraud them or "take[] unconscionable advantage" of them. (§ 1695.13.) There is, of course, some evidence of sharp dealing by Beckwith in connection with the personal loans she extended to Mr. Boquilon to cover his gambling losses. For example, she charged very high—arguably usurious—interest rates on these unsecured loans. Furthermore, according to Mrs. Boquilon, Beckwith treated her harshly when she threatened to seek legal counsel to pursue her rights to recover the equity she and her husband had in their home. But there is also ample evidence to support the trial court's findings that the transfer, refinancing and resale of the Boquilons' property was necessitated by their inability to keep up with required payments on both the house and Mr. Boquilon's debts, and that Beckwith's primary motive in dealing with the

---

[25]In their complaint, the Boquilons alleged that Panda Realty is a "business organization, form unknown." In an answer filed on behalf of Beckwith and Panda Realty, defense counsel issued a general denial to this and all other allegations in the plaintiffs' unverified pleading.

Boquilons was not to capture their home equity for herself but, rather, to help them out of their financial bind as a favor to a mutual friend.

The Boquilons argue that Beckwith's proposal to take title solely for the purpose of refinancing in her own name, and then return title to them under an assumption of the new financing, was a sham because they could no more qualify to assume the new loan than to refinance the property in their own names. Beckwith's real plan, they contend, was to "seize" their property to satisfy a relatively small debt, knowing that the Boquilons would not be able to keep up under the onerous payment schedule she established. However, the trial court apparently believed Beckwith when she testified that she was willing to wait as long as seven years for the Boquilons to clear their credit after bankruptcy in order to assume the American Savings loan, so long as the Boquilons at least kept current with the PITI (principal, interest, taxes, and insurance) payments she was personally obligated to make to the new mortgage holder. The trial court also apparently believed that it was not Beckwith's desire to seize the Boquilons' equity for herself,[26] but their failure to keep up with the payment schedule that precipitated the resale to the Friases. On this view of the evidence, the trial court did not err in concluding that Beckwith did not take "unconscionable advantage" of the Boquilons within the meaning of section 1695.13 and was not, therefore liable for the treble damages prescribed by the Act for such conduct (§ 1695.7).[27]

### E. The Trial Court Did Not Abuse Its Discretion to Determine the Amount of Attorney Fees to Be Awarded Under Section 1695.7.

■ Section 1695.7 provides: "An equity seller may bring an action for the recovery of damages or other equitable relief against an equity purchaser for a violation of any subdivision of Section 1695.6 or Section 1695.13. The equity seller *shall recover* actual damages plus *reasonable attorneys' fees and costs*." (Italics added for emphasis.) Since we have already determined that the Boquilons established a violation of various subdivisions of section 1695.6, subdivisions (a) and (e), there can be no real dispute under this mandatory attorney fees provision that they were entitled to an award of

---

[26]If that was the motivating factor, Beckwith was woefully ineffectual at accomplishing her objective. While she did manage to secure repayment of the gambling loans (plus interest), and recovered a small commission on the resale to the Friases, it appears that the bulk of the Boquilons' equity was absorbed by market depreciation, loan fees and closing costs associated with the refinancing, and commissions paid to other realtors in which Beckwith did not share.

[27]A fortiori, the trial court did not err by entering judgment for Beckwith on the plaintiffs' fraud cause of action, and refusing to award punitive damages under the general fraud statute or common law principles.

"reasonable attorneys' fees and costs." The only issue is whether the trial court abused its discretion in determining the amount of the fee award. (See *Nazemi* v. *Tseng* (1992) 5 Cal.App.4th 1633, 1642 [7 Cal.Rptr.2d 762] [determination of amount of attorney fees award will not be overturned on appeal absent a manifest abuse of discretion].) We conclude that there was no abuse of discretion in the court's determination that only 50 percent of the fees claimed by the Boquilons were reasonably incurred in establishing their Home Equity Sales Contracts Act cause of action.

Citing *Hensley* v. *Eckerhart* (1983) 461 U.S. 424 [76 L.Ed.2d 40, 103 S.Ct. 1933], *Serrano* v. *Unruh* (1982) 32 Cal.3d 621 [186 Cal.Rptr. 754, 652 P.2d 985], and *Sundance* v. *Municipal Court* (1987) 192 Cal.App.3d 268 [237 Cal.Rptr. 269] (*Sundance*), the Boquilons argue that the proof required to establish their Home Equity Sales Contracts Act claim was the same as that required to establish their fraud cause of action and that, therefore, they are entitled to recover fees for all of the time spent by their attorney on this case. We reject this argument.

In the first place, *Hensley*, *Serrano*, and *Sundance* are all cases in which attorney fees were awarded under a "private attorney general" theory. (Code Civ. Proc., § 1021.5; 42 U.S.C. § 1988.) As the court noted in *Sundance*, it is unfair in that context to saddle the prevailing plaintiff's attorney—as opposed to the defendant—with the costs of pursuing theories that prove unsuccessful or are discarded along the way to successful enforcement of important *public rights*. In that regard, "Section 1021.5 itself simply states that awards are to be made to successful parties, with no mention of excluding compensation for the successful parties' unsuccessful legal theories. Moreover, as a practical matter, it is impossible for an attorney to determine before starting work on a potentially meritorious legal theory whether it will or will not be accepted by a court years later following litigation. It must be remembered that an award of attorneys' fees is not a gift. It is just compensation for expenses actually incurred in vindicating a public right. To reduce the attorneys' fees of a successful party because he did not prevail on all his arguments, makes it the attorney, and not the defendant, who pays the cost of enforcing that public right." (*Sundance*, *supra*, 192 Cal.App.3d at p. 273.) No such "public right" is at stake in this case. The Boquilons obtained private counsel to vindicate their personal financial interest in the equity to their home. It was incumbent upon them, and their attorney, to negotiate an acceptable agreement to provide for payment of attorney fees in the event the court did not award fees for all time spent on the case.

Even if the "private attorney general" authorities cited by the Boquilons apply in this case, however, it is still a matter within the "discretion of the

trial court to determine whether time spent on an unsuccessful legal theory was reasonably incurred." (*Sundance, supra,* 192 Cal.App.3d at p. 274.) In this case, the Boquilons spent a great deal of time at trial—including the bulk of their expert's time—in an attempt to show that Beckwith acted unprofessionally, with fraudulent intent, and misled them for her own financial gain. Such a showing may have been required to establish "unconscionable" conduct in violation of section 1695.13 and their entitlement to *exemplary damages* under the Act (§ 1695.7), as well as their entitlement to tort damages for fraud. But the trial court roundly rejected the Boquilons' evidence on these issues, and no such showing was required to establish the more basic violations of the Act. We discern no abuse of discretion in the trial court's determination that half of the court's time and, by logical extension, half of plaintiffs' counsel's and expert's time, was spent in an effort to portray Beckwith as a bad actor, and that this time was not "reasonably" spent. (Cf. *Sokolow* v. *County of San Mateo* (1989) 213 Cal.App.3d 231 [261 Cal.Rptr. 520] [trial court has discretion to award less than full amount of attorney fees sought under Code Civ. Proc., § 1021.5 where prevailing party has achieved only limited success in achieving the objectives of the litigation].) Accordingly, the award of attorney fees in the amount of $19,852.50 must be affirmed.

### III. Conclusion

For all the foregoing reasons, the judgment of the trial court is modified to reflect an award of $39,564.31 for actual damages due the Boquilons, plus prejudgment interest from October 26, 1990, to date. As so modified, the judgment is affirmed. The Boquilons shall recover "reasonable attorneys' fees and costs" on appeal in an amount to be determined by the trial court on remand.

Haerle, J., concurred.

KLINE, P. J., Concurring and Dissenting.—I concur in the modification of the judgment of the trial court increasing the amount of actual damages due the Boquilons, together with prejudgment interest, and the award of attorney fees at trial and on appeal.

I respectfully dissent from that portion of the majority opinion concluding that Beckwith did not violate subdivision (b)(3) of Civil Code Section 1695.6,[1] and that the Boquilons are therefore not entitled to a mandatory award of exemplary damages. The majority's forced finding flies in the face of the language of the Home Equity Sales Contract Act (the Act) and frustrates its purpose.

---

[1] All statutory references are to the Civil Code.

## I.

The purposes of the Act could not have been more clearly stated. In the first section, the Legislature finds that "financially unsophisticated" home-owners whose residences are in foreclosure "have been subjected to fraud, deception and unfair dealing by home equity purchasers . . . through the use of schemes which often involve oral and written misrepresentations, deceit, intimidation, and other unreasonable commercial practices." (§ 1695, subd. (a).) Accordingly, and in order to advance "the express policy of the state to preserve and guard the precious asset of home equity," the chief purposes of the Act are "to require that the sales agreement be expressed in writing; to safeguard the public against deceit and financial hardship; to insure, foster, and encourage fair dealing in the sale and purchase of homes in foreclosure; to prohibit representations that tend to mislead; to prohibit or restrict unfair contract terms; to afford homeowners a reasonable and meaningful opportunity to rescind sales to equity purchasers; and to preserve and protect home equities for the homeowners of this state." (§ 1695, subd. (d)(1).)

In order "to effectuate this intent and to achieve these purposes," the Legislature also declared that the Act "shall be liberally construed." (§ 1695, subd. (d)(2).)

Ignoring both this directive and the purposes it was designed to achieve, the majority creates an ambiguity that does not genuinely exist and resolves it against the sellers the Act was designed to protect and in favor of the purchasers they were to be protected against. As will be seen, the paradoxical result of the majority's strained analysis is to bar application of the mandatory exemplary damages provision of the Act to a sophisticated equity purchaser who violates its most fundamental requirements: "that the sales agreement be expressed in writing" and that homeowners have "a reasonable and meaningful opportunity to rescind sales to equity purchasers." (§ 1695, subd. (d)(1).)

## II.

The majority's conclusion that subdivision (b)(3) of section 1695.6 is inapplicable in this case is based on the fact that the transfer or encumbrance of a residence in foreclosure is prohibited under that statute before "the time within which the equity seller may cancel the transaction has fully elapsed . . . ." (§ 1695.6, subd. (b).) As stated by the majority, "Section 1695.6, subdivision (b)(3) applies to the situation where an equity purchaser has given the notices required by the [Home Equity Sales Contract] Act but, nevertheless, proceeds to transfer or encumber the property within the

statutory cancellation period." (Maj. opn., *ante*, at p. 1713.) Because Beckwith's transfer of an interest in the Boquilons' residence to her husband did not occur within this so-called " 'cooling off' period" (*Segura* v. *McBride* (1992) 5 Cal.App.4th 1028, 1035 [7 Cal.Rptr.2d 436]), the majority concludes it is not within the ambit of the statute.

The reason there was no "cooling off" period, of course, is that Beckwith failed to provide a written sales agreement fully advising the Boquilons of their statutory cancellation rights, as required by the Act. (§§ 1695.3, subd. (g), 1695.5, subd. (b).) By holding that subdivision (b)(3) does not apply to a knowledgeable purchaser like Beckwith who never advises a seller of his or her cancellation rights, on the theory that a cancellation period that never began cannot expire, the majority enters the realm of Alice in Wonderland.

As its very title suggests, the Act was designed to protect equity sellers primarily by requiring the equity purchaser to provide a written "Home Equity Sales Contract"[2] which must, among other things, grant the equity seller (in addition to any other right of rescission) the right to cancel the contract "until midnight of the fifth business following the day on which the equity seller signs any contract or until 8 a.m. on the day scheduled for the sale of the property pursuant to a power of sale conferred in a deed of trust, whichever occurs first." (§ 1695.4, subd. (a).) The centrality to the legislative scheme of the right of cancellation is reflected by the excruciating detail in which the right is spelled out. For example, section 1695.5 provides that "[t]he contract shall contain in immediate proximity to the space reserved for the equity seller's signature a conspicuous statement in a size equal to at least 12-point bold type, if the contract is printed or in capital letters if the contract is typed, as follows: 'You may cancel this contract for the sale of your house without any penalty or obligation at any time before (Date and time of day).' "

Not only must the right of cancellation be conspicuously set forth in the contract itself, but the contract must refer to and be accompanied by a separate "notice of cancellation form" which explains the right of cancellation in still greater detail. (§ 1695.5, subds. (a) and (b).)

Subdivision (a) of section 1695.6 states that the required contract "shall be provided and completed in conformity with those sections by the equity purchaser." In effect, the majority says that whenever an equity purchaser violates subdivision (a) he or she cannot violate any of the prohibitions of

---

[2]The Act defines "contract" as "any offer or any contract, agreement, or arrangement, or any term thereof, between an equity purchaser and equity seller incident to the sale of a residence in foreclosure." (§ 1695.1, subd. (e).)

subdivision (b).[3] According to the majority, an equity purchaser who fails to provide the equity seller a written contract embodying the mandated right to cancel cannot transfer the residence before expiration of the cancellation period, in violation of the statute, because such period never began and therefore cannot terminate. This analysis will surely surprise the State Legislature, because it means that a sophisticated equity purchaser who transfers the residence to a third party after deliberately failing to provide the equity seller notice of the statutory right to cancel will receive more lenient treatment than an equity purchaser who has given notice of the right but transfers the residence to a third party before the right to cancel has expired. The Legislature cannot reasonably be thought to have intended to punish a purchaser who has at least provided a written contract providing notice of cancellation rights more severely than a knowing purchaser who has not done so. The sophisticated purchaser who transfers the residence to a third party without notifying the seller of his or her cancellation rights commits a more egregious violation of the Act than a purchaser who makes such a transfer after providing such notice but before expiration of the right to cancel. In the latter situation the seller is on notice of the right and still in a position to enforce it. A seller without a contract of sale is far less likely to be aware of the right and the time within which it lapses and is therefore at a much greater disadvantage. The fact that subdivision (b)(3) assumes that the purchaser has at least given the seller notice of the statutory cancellation rights provides no reason to protect a sophisticated purchaser who has not even done that from the exemplary damages that would otherwise apply.

The majority's conclusion that it would make no sense for the Legislature to impose mandatory punitive damages on an equity purchaser who fails to provide a written contract of sale flows from its belief that this requirement is merely "technical" (maj. opn., *ante*, at p. 1716), and is therefore presumably less vital to the purpose of the legislative scheme than the right to notice of cancellation. As analysis of the Act reveals, the opposite is true. As Justice Anderson pointed out in *Segura* v. *McBride*, *supra*, 5 Cal.App.4th 1028, 1035, the requirement that the agreement be in writing is "[a]t the heart of the scheme." It seems to me anomalous to think the Legislature intended to deny mandatory punitive damages for denial of the fundamental right to a written contract, but allow such relief for violation of a merely derivative right.

---

[3]In addition to the prohibition on the transfer or encumbrance of a residence in foreclosure set forth in section 1695.6, subdivision (b)(3), with which we are here concerned, subparagraphs (1) and (2) of subdivision (b) provide that an equity purchaser may not "[a]ccept from any equity seller an execution of, or induce any equity seller to execute, any instrument of conveyance of any interest in the residence in foreclosure" and may not "[r]ecord with the county recorder any document, including, but not limited to, any instrument of conveyance, signed by the equity seller."

### III.

The majority's conclusion that subdivision (b)(3) of section 1695.6 is inapplicable to this case rests in part on the view that Beckwith's conduct is instead covered by subdivision (e) of that statute. Subdivision (e), which is set forth in its entirety in the margin below,[4] prohibits an equity purchaser who has previously acquired a residence in foreclosure from transferring the property to a third party without the written consent of a seller who has retained an option to repurchase. I agree with my colleagues that Beckwith has violated subdivision (e), but disagree that she cannot be held to have violated both provisions and separately penalized.

Subdivisions (b)(3) and (e) of section 1695.6 address different situations. The former applies to the transfer or encumbrance by an equity purchaser of any interest in a residence in foreclosure to a third party prior to expiration of the period within which the equity seller has a right to cancel the contract of sale. Subdivision (e), on the other hand, does not implement or in any way relate to an equity seller's statutory right to cancel, indeed it comes into play only if the seller's right to cancel has expired. The right that subdivision (e) implements is the right of the equity seller to exercise an option to repurchase the residence in foreclosure before it is conveyed to a third party. Unlike the right to cancel, this right is not mandated by statute and comes into play only if the equity purchaser agrees to allow the equity seller a repurchase option.

A purchaser who violates subdivision (b)(3) of section 1695.6 will not necessarily be in violation of subdivision (e) and a purchaser who violates subdivision (e) will not necessarily violate subdivision (b)(3). The majority's analysis is therefore not, as my colleagues claim, "consonant with the well-worn maxim that a more specific provision relating to a particular subject will govern in respect to that subject, as against a general provision, although the latter standing alone would be broad enough to include the subject to which the more particular provision relates. [Citations.]" (Maj. opn., *ante*, at p. 1714, fn. 16.) Subdivision (b)(3), which the majority posits as the more general provision, is not broad enough to invariably include the subject to which subdivision (e) relates.

While it is true that a purchaser who violates section 1695.6, subdivisions (a) and (e) will always also be in violation of subdivision (b)(3), this

---

[4]"Whenever any equity purchaser purports to hold title as a result of any transaction in which the equity seller grants the residence in foreclosure by any instrument which purports to be an absolute conveyance and reserves or is given by the equity purchaser an option to repurchase such residence, the equity purchaser shall not cause any encumbrance or encumbrances to be placed on such property or grant any interest in such property to any other person without the written consent of the equity seller." (§ 1695.6, subd. (e).)

provides no rational basis upon which to exempt such a purchaser from the more severe penalty ordinarily attendant upon violation of subdivision (b)(3). On the contrary, the violation of an equity seller's right to cancel—either by transferring or encumbering the residence prior to expiration of the cancellation period or, as here, by depriving the seller of notice of the right to cancel—relates to the ability of an owner of a residence in foreclosure to retain the property in the first place, which the Legislature thought more significant than the repurchase right that is the subject of subdivision (e), which, as noted, is not mandated by statute and exists only at the sufferance of the equity purchaser. The Legislature apparently believed it would be unwise to impose exemplary damages on an equity purchaser who provides notice of a seller's right to rescind an equity sales contract but infringes his or her option rights, since purchasers are not required by law to grant sellers an option to repurchase and might not do so if impairment of such a right would subject them to treble damages. While the interests of equity sellers are thus served by protecting equity purchasers against exemplary damages for infringement of their option rights, there is no such reason for leniency in the case of a sophisticated purchaser, like Beckwith, who not only infringes an equity seller's option rights but does not even provide contractual notice of the seller's inalienable right to rescind.

## IV.

For the reasons just set forth, the overlap between subdivisions (b)(3) and (e) of section 1695.6 that occurs in the limited situation in which a knowledgeable equity purchaser violates both subdivision (a), by failing to provide the equity seller contractual notice of the right to cancel, and subdivision (e), by failing to obtain the written consent of the seller to waive his option to repurchase and permit sale of the residence to a third party, and thereby also violates subdivision (b)(3), does not create any ambiguity that needs to be resolved by a judicial selection of one violation or the other. As has been explained, the subdivisions are designed to achieve different purposes and the equity purchaser who violates both requirements should not for that reason be exempt from the more severe penalty related to the more serious of the two violations, that proscribed by subdivision (b)(3).

Even if there were an ambiguity, however, settled principles would bar this court from resolving it in favor of sophisticated equity purchasers, as the majority has done. Not only are equity sellers the persons the Act is designed to protect, but the protections it affords are as against equity purchasers. Furthermore, lest there be any question about which party is intended to receive the benefit of legitimate doubts, the Legislature inserted a requirement that the Act be "liberally construed" to effectuate the legislative intent

and achieve its purposes. (§ 1695, subd. (d)(2).) By creating an ambiguity that does not exist, and then resolving it against those the Legislature felt it necessary to protect, the majority unjustifiably defeats the will of a co-equal branch of state government. This should not be done.

## V.

Throughout this concurring and dissenting opinion I have used the adjectives "sophisticated" or "knowledgeable" when referring to the equity purchaser against whom the Act protects an equity seller. While the Act has equal application to equity purchasers who may be unsophisticated, the evils of concern to the Legislature are much more likely to be present when the equity purchaser is wise in the ways of the real estate business and the seller is not. More importantly, the equity purchaser in this case is a licensed real estate agent vastly more knowledgeable about real estate and credit transactions than the equity sellers. The record shows that the Boquilons submitted to Beckwith's will in large part because of her superior knowledge of the real estate business, and that Beckwith exploited this advantage in committing precisely the offensive acts—including "misrepresentations, deceit, intimidation, and other unreasonable commercial practices"—the Legislature sought to prevent. (§ 1695, subd. (a).)

The majority's indifference to these considerations is inexplicable because it does not comport even with its own analysis of the law. The majority argues that the Legislature did not intend an expansive reading of section 1695.6, subdivision (b)(3), because that "would require an award of treble damages in every case in which *an innocent and ignorant equity purchaser* failed to provide a written contract or to fulfill completely the other technical requirements of the Act, and proceeded to deal with the property as the new owner by encumbering or transferring any interest in it." (Maj. opn., *ante*, at p. 1715, original italics deleted, new italics added.) The majority concludes, therefore, that the Legislature intended to authorize exemplary damages only in the exceptional, not the ordinary case, and only in those cases where the violation of the Act was knowing and intentional. (*Ibid.*)

Reasonable minds might differ as to whether the majority's analysis makes sense when applied to equity purchasers genuinely ignorant of the statutory requirement of a written contract providing notice of the right to cancel, but I think few would agree it makes sense when applied to a state licensed real estate professional. Because Beckwith is such a person, and must therefore be deemed knowledgeable of the statutory duty she failed to discharge, this is "the exceptional, not the ordinary case," in which even the majority agrees exemplary damages are appropriate.

Our opinion in *Easton* v. *Strassburger* (1984) 152 Cal.App.3d 90 [199 Cal.Rptr. 383, 46 A.L.R.4th 521] is instructive in this regard. We held in that case that a real estate broker representing the seller of residential property has a duty to disclose facts, including "the affirmative duty to conduct a reasonably competent and diligent inspection of the residential property listed for sale and to disclose to prospective purchasers all facts materially affecting the value or desirability of the property that such an investigation would reveal." (*Id.*, at p. 102, fn. omitted.) We justified imposition of a duty to disclose not only that which is known but also "*that which should be known*" on two grounds, neither of which were statutory:[5] first, that such a duty "is a formally acknowledged professional obligation that it appears many brokers customarily impose upon themselves as an ethical matter" (152 Cal.App.3d at p. 101); and, second, because of the special role played by real estate brokers. With respect to the latter consideration we recalled the statement by "Judge Cardozo, as he then was, in a different but still relevant context: 'The real estate broker is brought by his calling into a relationship of trust and confidence. Constant are the opportunities by concealment and collusion to extract illicit gains. We know from our judicial records that the opportunities have not been lost . . . . He is accredited by his calling in the minds of the inexperienced or the ignorant with a knowledge greater than their own.' (*Roman* v. *Lobe* (1926) 243 N.Y. 51, 54-55 [152 N.E. 461, 462-463; 50 A.L.R. 1329, 1332] quoted in *Richards Realty Co.* v. *Real Estate Comr.* (1956) 144 Cal.App.2d 357, 362 [300 P.2d 893]; . . .)" (*Id.*, at p. 100.)

If a duty can be imposed on a real estate professional even though it does not arise under statute and relates to a person with whom the professional is not in privity, an equally important duty should a fortiori be imposed when it *does* arise under statute and relates to a person with whom the professional *is* in privity.

The fact, which the majority underscores, that Beckwith "had never heard of the Home Equity Sales Contracts Act when the Boquilons conveyed their property to her" (maj. opn., *ante*, at p. 1714, fn. 17), seems to me anything but exculpatory, even if true. A state licensed real estate professional should not be permitted to use her ignorance of the basic requirement to provide a written sales contract, which is hardly an obscure duty and should be known by all real estate agents, to insulate herself from liability for its breach. The real estate broker in *Easton* v. *Strassburger, supra*, was as ignorant of the defect in the property involved in that case as Beckwith claims to be of the real estate law. There is no more reason here than there was in *Easton* to permit such ignorance to be used to advantage.

---

[5] The holding of our opinion in *Easton* v. *Strassburger, supra*, was later codified by the Legislature. (§ 2079; Stats. 1985, ch. 223, § 4, p. 1222.)

For the foregoing reasons, I would reverse that portion of the judgment refusing to award exemplary damages to the Boquilons pursuant to section 1695.7.

A petition for a rehearing was denied November 5, 1996. Kline, P. J., was of the opinion that the petition should be granted.